THE CITY OF CAMDEN, A MUNICIPAL CORPORATION,
PLAINTIFF-APPELLANT, v. SOUTH JERSEY PORT COM-
MISSION, SOMETIMES REFERRED TO AS SOUTH JER-
SEY PORT DISTRICT, A PUBLIC CORPORATION, DE-
FENDANT-RESPONDENT.

Argued April 10, 1950—Decided April 24, 1950.

358

360

*Mr. Norman Heine* argued the cause for the appellant (*Mr. John J. Crean,* attorney).

*Mr. Laurence L. Crispin* and *Mr. J. Raymond Tiffany* argued the cause for the respondent (*Mr. Theodore D. Parsons,* Attorney General).

The opinion of the court was delivered by

VANDERBILT, C. J. The South Jersey Port District comprising the counties of Burlington, Cape May, Camden, Cumberland, Gloucester, Mercer and Salem, was created by *P. L.* 1926, *Chapter* 336 (*R. S.* 12:11-1 *et seq.*), and thereby declared a public corporation and awarded the usual corporate powers. A Port Commission was also created to serve as the governing body of the district and was given the power to "determine upon the location, type, size and construction of requisite port facilities" as well as the power to "lease, * * * construct, make, equip and maintain port facilities in the district."

The act set up a plan for the payment of construction charges. Whenever the Port Commission should determine to construct any port or transportation facilities the cost should be estimated on the basis of definite plans and specifications. The Commission should determine and report the proportionate benefit which would accrue from such improvements to each county or municipality within the district. After public hearings on these findings the respective counties and municipalities were to be advised of their proportionate share, which would then be raised by a tax on all of the taxable

property in such county or municipality, but not to exceed in any one year ten cents on each one hundred dollars of taxable property in such county or municipality. The several counties or municipalities were thereupon required to submit the question of the levy of the tax to a referendum.

In 1927 the Port Commission decided to construct its own pier and warehouse at Beckett Street on lands adjoining a pier already owned and operated by the City of Camden at Spruce Street. It determined that the construction cost of the Beckett Street pier would be two million dollars, and that all the benefits thereof would accrue to the City of Camden. The question of levying a tax to support this project was submitted to the voters of Camden at the general election in November, 1927, and a majority voted in its favor.

Apparently because of questions raised by the bond attorneys with respect to the legality of the financing procedure under the 1926 Act, an alternative method of financing the proposed pier and warehouse was set up in *P. L.* 1928, *Chapter* 64 (*R. S.* 12:11–26 to 39). Under this new statute the Port Commission was authorized to enter into contracts with any county or municipality in the district, under which the municipality would lend to the Port Commission agreed sums of money for the purpose of financing the project. The Port Commission, however, had the power to issue bonds from time to time in anticipation of the payments to be made to it under any such contract, but these bonds would not be an indebtedness of the contracting county or municipality. The moneys loaned by any such contracting county or municipality were to be repaid by the Port Commission, together with interest at the rate of 4% annually.

Instead of proceeding further under the provisions of the 1926 statute, the City of Camden and the Port Commission on June 6, 1928, entered into an agreement under the provisions of the 1928 statute. Under the agreement the city agreed to appropriate and pay to the Port Commission for the purpose of financing the project $65,000 on the first days of March and September in each of the years 1929 to 1933, both inclu-

sive, and $45,000 on the first day of March and $145,000 on the first day of September of each of the years 1934 to 1973, both inclusive. Under the provisions of the agreement the Port Commission was required on or before December 31st of each year to pay to the City all moneys which, in the *uncontrolled discretion* of the Port Commission, were then in its hands and not required for purposes specified in the agreement. Until the total amount paid by the City to the Port Commission should be repaid with interest thereon at the rate of 4% per annum, the amounts so paid were to be applied first to the payment of interest and the balance to the payment of principal.

The parties operated under the terms of this agreement, apparently without difficulty, until September 1, 1946, when the City defaulted in its payment due on that day in the sum of $145,000. It has since refused to make any payments due under the contract, with the exception of $45,000 which it paid on March 1, 1947. An action at law brought by the Port Commission in the former Supreme Court to recover for the amount due on the contract was restrained on an order obtained by the City, and the action was later discontinued. The subject matter of it, however, is contained in the counterclaim in the instant case. At the present time the back payments due to the Port Commission under the contract total $525,000, together with interest in the sum of $46,769.18. As of December 31, 1947, the Port Commission was indebted to the City for money loaned under their agreement in the principal sum of $2,810,889.75, together with interest in the amount of $304,150.64. This sum represents the total annual amount advanced by the City to the Port Commission, less the sums repaid by the Port Commission to the City.

On June 28, 1928, the City adopted a resolution appointing the Port Commission as the operating agent of its own pier at Spruce Street, just about then completed at a cost of over $650,000, and this appointment was accepted by the Port Commission the following day. Under this resolution the City was to receive all revenues and bear all expense in con-

nection with said appointment. The resolution further provided that a contract should be entered into between the City and the Port Commission concerning the operation of the pier. This contract was signed on June 1, 1931. It thus appears that the Port Commission has been in possession of the City's pier property and has operated it since June, 1928. In the operation of the Spruce Street pier the Port Commission has seen fit to set up certain reserve funds for repairs and maintenance, without further authorization to do so by the City. These reserved funds total $155,824.54, and interest alleged to be due thereon amounts to $48,839.71.

This action was instituted by the plaintiff seeking (1) an accounting for the operation and management by the defendant of the Spruce Street pier and to charge the defendant with dereliction of its duty as an agent with respect thereto; (2) to have the agreement entered into between the plaintiff and defendant dated June 6, 1928, declared *ultra vires,* illegal and void, and to obtain a judgment for the full amount of the sums thus far advanced under the agreement, regardless of whether it be held valid or invalid, and (3) to obtain an order directing the defendant to determine and report the proportion of benefit that accrued from the construction of the Beckett Street pier to each county or municipality within the South Jersey Port District, and to require such counties and municipalities to pay the respective and proportionate shares thus found.

The defendant denied the several claims of the plaintiff and demanded as alternative relief a judgment against the plaintiff for breach of the contract of June 6, 1928, in a sum allegedly due under the terms of that agreement to date, but unpaid.

The court below gave judgment to the City for the sum of $204,664.25, representing the reserve funds set up in the operation of the City's Spruce Street pier and interest thereon, and gave judgment to the Port Commission for the sum of $571,769.18, representing the payments due from the City under the agreement of June 6, 1928, and interest thereon.

This left a net sum of $367,104.93, payable under the judgment by the City to the Port Commission. From that portion of this judgment adverse to it each party has appealed and that appeal has been certified by this Court on the petition of the plaintiff.

As the points argued by the parties on this appeal are the same with one exception, they will be considered here in the order in which they appear in the respective briefs.

■ (1) Is the contract of June 6, 1928, *ultra vires?* It is contended by the City that the contract in question is *ultra vires* because the 1928 act (*R. S.* 12:11–26 *et seq.*) specifically empowers only the Port Commission to enter into such a contract, and that in the absence of express authorization by the Legislature a municipality lacks any authority to enter into such a contract. It is pointed out that the Legislature in the case of the Port of New York Authority, provided by statute (*R. S.* 40:68–20) that any municipality would have the authority to cooperate and contract with the Port Authority but that in the statute here involved no such right was specifically granted, and that therefore the Legislature never intended to give municipalities in the South Jersey Port District the right to enter into contracts with it. This argument, however, places too narrow a construction upon the statute here involved and ignores the clear legislative intent as expressed in the statute as a whole. For example, the title of *P. L.* 1928, *Chapter* 64, which may be considered as an aid in determining the legislative intent, is explicit:

"An act to authorize the financing of the projects of the South Jersey Port Commission; to authorize a contract or contracts for said purpose between the said commission and a county or municipality, or several of them; to authorize the issuance of bonds of the said commission; and to authorize payments by counties and municipalities to the commission, to be raised by taxation or otherwise."

Furthermore, in the body of the act it is provided as follows:

"*R. S.* 12:11–26. The Commission is hereby authorized to enter into contract with any county or municipality, or several of them

within the district, and from time to time amend or supplement the same, and any such contract may contain any or all of the following terms or provisions:

"a. An agreement by the commission to undertake any project or projects which it may be authorized to undertake.

"b. An agreement by the county or municipality to appropriate and pay to the commission such sums in such years, and at such date or dates in each year, as may be agreed for the purpose of financing such project or projects. Without intending to restrict the broadest construction of the words 'financing such project or projects' such words shall include the payment of the cost of construction and reconstruction of any improvement, the acquisition of property, the cost of maintenance, operations and repairs, and the payment of interest and principal of debt incurred for any of said purposes."

"R. S. 12:11-30. Before any contract shall be effective to bind a municipality it shall be authorized or ratified by an ordinance of the municipality, which ordinance shall set forth the contract in full. The ordinance shall be deemed an ordinance authorizing an improvement and it shall take effect at the same time and subject to a protest or protests and ratification at an election as provided by law for such ordinances."

That a municipality is authorized to develop its waterfront and to contract therefor, as well as to lease its facilities so constructed, is also sustainable under the provisions of R. S. 40:68-1 et seq. and R. S. 40:179-1, dealing with waterfront improvements. The former of these two statutory provisions is relied upon by the City in its brief for the purpose of showing that only with respect to the Port of New York Authority are municipalities specifically authorized to enter into contracts. A mere recital of these statutory provisions is sufficient in itself to dissolve the City's argument. R. S. 40:68-20 provides as follows:

"Any municipality may cooperate with the port authority in the establishment, maintenance and operation of marine terminals within the corporate limits of such municipality, and for such purposes is hereby vested with the following powers, which shall be exercised on behalf of such municipality by its governing body by ordinance, in the discretion of such governing body: * * *

"b. Enter into contracts with the port authority for the establishment, acquisition, construction, operation, maintenance and use of marine terminals and property for marine terminal purposes, either by the municipality or by the port authority, upon such terms and con-

ditions as may be agreed upon between the governing body and the port authority, and to do so without advertisement or public notice otherwise than is required for the adoption of the ordinance."

A previous section of this same statute apparently was overlooked by the City, for *R. S.* 40 :68–17 sets forth the definition of the words "port authority" as follows :

"As used in this article 'port authority' means the Port of New York Authority created by compact of April thirtieth, one thousand nine hundred and twenty one, between the States of New York and New Jersey, with the consent of Congress and *also any other public body or corporation of the State of New Jersey authorized by law to establish, maintain or operate a marine terminal.*" (Italics added.)

In the light of these statutory provisions there can be no doubt that the Legislature intended and made its intention clear that the municipality in this case had authority to enter into the contract here in question.

(2) Is *R. S.* 12 :11–26 to 39, the statute authorizing the contract, offensive to the loan or gift clauses of the Constitution, and thereby unconstitutional and the contract illegal and void?  Article I, paragraph 19 of the 1844 Constitution, which was carried into the Constitution of 1947 in Article VIII, Section III, paragraph 2, provides as follows :

"No county, city, borough, town, township, or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation."

Article I, paragraph 20 of the 1844 Constitution, which was carried over into Article VIII, Section III, paragraph 3, of the 1947 Constitution, reads as follows :

"No donation of land or appropriation of money shall be made by the State, or any municipal corporation, to or for the use of any society, association, or corporation, whatever."

The City contends that these constitutional provisions render the transaction here involved illegal, whether it be con-

sidered a gift or a loan, and it urges that the court below erred in concluding that these provisions applied only to private corporations and not to public corporations. In support of its argument the City seeks comfort in the recent case of *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949). In the *Turnpike case,* however, the issue turned not on the provisions of the Constitution above quoted but on the provisions of Article VIII, Section II, paragraph 2, which provide "no money shall be drawn from the state treasury but for appropriations made by law," and also upon the fact that there was a diversion of appropriated funds. That problem is not involved here and therefore the *Turnpike case* cannot be considered as authority in support of the City's position. It is well established, not only in New Jersey but in most of the states of the Union, that such prohibitions do not apply to gifts or appropriations or loans to a public corporation to finance a public purpose. Nor can there be any doubt in the instant case that the defendant Port Commission is a public corporation and that the money advanced to it is being used for a public purpose.

(3) Do the statute and the contract under it violate the provisions of the Constitution requiring taxes to be assessed under uniform rules, Article IV, Section VII, paragraph 12 of the Constitution of 1844 and Article VIII, Section I, paragraph 1 of the Constitution of 1947, and constitute an attempt to regulate the internal affairs of towns and counties, contrary to the provisions of Article IV, Section VII, paragraph 11 of the Constitution of 1844 and Article IV, Section VII, paragraph 9 (6) (13) of the Constitution of 1947? First, with respect to taxation, the City contends that the act is unconstitutional in that it taxes the property of the citizens of Camden more than the property of any other citizens of the State for services rendered to the State, or at least to a major part thereof. There is no disputing the fact that for a tax to be constitutional it must satisfy three requisites; it must be imposed for a public and not a mere private purpose; it must be laid according to some rule of apportion-

ment and not arbitrarily; and if the tax is imposed upon one of the municipal subdivisions of the State only, the purpose must, as regards the people of that subdivision, be local. The facts in the instant case meet all three of these requirements. The purpose is obviously public and it is not seriously contended otherwise. The act itself does not levy any tax but permits a municipality voluntarily to enter into the contract and to levy the tax necessary to meet its obligations under the contract. Whether or not the City is levying the tax equally is a matter completely within its own control and entirely outside of the provisions of the act here questioned. And the purpose for which the money here is being spent is local. The pier itself is located within the City of Camden and that city is deriving the principal benefits therefrom. Certainly it could not be required or hoped that a municipality would be able to restrict the expenditure of its funds to such purposes as would only be of benefit to its own inhabitants. Virtually all public improvements within a municipality are of benefit primarily to the residents thereof but also substantially to persons residing outside of the limits of that particular political subdivision. One cannot measure the benefit which accrued to those outside of Camden by virtue of the construction of the Beckett Street pier any more than one can ascertain the benefit derived from the use of a municipality's roads and streets by those who are not resident within its borders. All that is required, as far as the Constitution is concerned, is that the people of the municipality have a special and peculiar interest in the purpose being accomplished. Prior to the time this particular contract was entered into the Port Commission had found as a fact that the City of Camden would alone benefit by the construction of the pier and by virtue of its having entered into the contract voluntarily it may be assumed that the City of Camden acquiesced in that finding of fact. Next, no argument at all is made by the City to support its contention that the statute or the contract is a regulation of the internal affairs of the City. Suffice it to say that there has been no interference in the internal affairs

of the plaintiff; it was left completely free to accept or reject the benefits which might accrue to it under this act.

■ (4)· Is the South Jersey Port Commission required to determine and report the proportion of benefits which have accrued from the construction of its facilities to each county and municipality in the South Jersey Port District and to compel the said counties and municipalities to pay their respective proportionate share of such benefits? In arguing in the affirmative the City goes on the theory that the financing arrangement entered into was under the provisions of the 1926 Act (*R. S.* 12:11–1 *et seq.*) which provided that the Port Commission should determine the cost and apportion it among the various benefitting counties and municipalities. It should be pointed out first that while negotiations were in progress under these statutory provisions the Port Commission actually found that the City of Camden would be the sole municipality to benefit. Second, it should be noted that the contract actually entered into was a scheme under the provisions not of the 1926 act but of the 1928 act, which is found in *R. S.* 12:11–26 *et seq.* This 1928 act provided a clear and complete method of financing a public port, independent of and additional to the procedure previously provided by the 1926 act. There is no requirement in the 1928 act nor in the contract entered into thereunder that requires any such determination of benefits or proportioning of the costs.

■ ■ (5) When is a loan due when there is no specified due date, and repayment rests in the uncontrolled discretion of the debtor? The plaintiff argues that in an ordinary contract for the payment of money when no due date is provided the obligation is immediately due or is due upon demand or is due within a reasonable time, and that therefore as the City has here demanded the return of its money and as over 20 years has elapsed since the contract was entered into, it is entitled to an immediate repayment; and further that if the contract here is not so construed, the Port Commission could defeat the City's claim or at least postpone the payment into

eternity. To rebut this argument it is not necessary to consider the contention of the defendant that the arrangement here is not a loan but a payment in the furtherance of a joint enterprise. The cases cited by the plaintiff are ones in which no specific time or method of repayment was provided for. Such is not the case here. The contract entered into by the parties specifically sets forth the mode and method by which the Port Commission would repay the money advanced to it by the City. It is provided in Article III, paragraph 2 of the contract as follows:

> "All moneys which in the uncontrolled discretion of the Port Commission are then in its hands, and are not required for the said purposes, shall on or before said 31st day of December be paid by the said Port Commission to the city until the total amount so paid shall equal the amount paid by the city to the Port Commission with interest thereon at the rate of 4 per centum per annum. The amounts so paid shall first be applied to the payment of interest and the balance thereof shall be applied to the payment of the principal."

This amounts to an agreement to repay "when able." Such a conditional promise to repay has been frequently upheld in the courts and in the absence of any showing by the plaintiff that the Port Commission here has funds with which to pay it must follow that the City's claim for an immediate repayment is unwarranted. It would also seem premature to require the defendant here to repay the City in full before the City has met its obligations to finance the port operation, particularly since the plan of financing and operating the port facility envisioned the creation of a bonded indebtedness to the payment of which the City directly pledged its annual payments and to which the defendant not only allocated these payments but also its other income. The theory of the plaintiff, if followed, would perpetrate a fraud upon all the bond holders and would prevent the consummation of the project before it had been fairly started. The times set for the City's payments, construed most liberally for the plaintiff, indicate clearly that the City cannot require a full or partial repayment prior to 1973. In any event, that the project might eventually prove such that it will be impossible for the de-

fendant ever to repay the plaintiff, is not a matter for consideration here. The function of the court is not to make contracts but rather to enforce them.

(6) Does an agent operating the principal's property have a right to withhold funds without authority from the principal and create cash reserves from the profits resulting from operations of the principal's property? This question relates to the contract entered into between the City and the Port Commission whereby the Spruce Street pier was turned over to the Port Commission for operation. The court below held that the arrangement was merely a limited agency which did not vest the defendant with the power to reserve funds for the maintenance and repair of the Spruce Street pier. This question as worded by the plaintiff and as construed by the court below presumes two facts, first, that the defendant is a limited agent of the plaintiff and, second, that the defendant set up reserves without authority. Neither proposition would seem to be supported. The contract by which the defendant agreed to operate the pier for the plaintiff, entered into in 1931, is more than a mere agency agreement. Instead, it appears to constitute a complete delegation of authority with respect to the pier with the only vestige of control remaining in the plaintiff being the right to a regular accounting. The contract had incorporated into it by reference the 1928 contract concerning the Beckett Street pier. The 1931 contract contemplated that the Spruce Street pier and the Beckett Street pier would be operated in a similar manner and in such fashion as to avoid any conflict in the management or service rendered by the two properties. As the 1928 contract specifically recognizes and provides for the creation of such reserves, as sound business management would seem to demand them, and as the properties were operated by the defendant for a period of almost 20 years before any question was raised, it appears that the reserves here in dispute were created in accordance with the contract.

In addition to these reserves the defendant has retained profits resulting from the operation of the Spruce

Street pier. The defendant argues that the 1928 and 1931 contracts were merged and that it is entitled to retain the profits and reserves subject only to payment to the plaintiff under the conditions of the 1928 contract. It is not necessary, however, for us to decide the merit of that argument. We were told at the oral argument that since the trial below the head of the Spruce Street pier has collapsed into the river so that it can no longer be operated as a pier and that the City has been unwilling to declare its position as to repairing it. With the operation of the pier thus terminated the rights of the defendant to retain the profits or reserves are likewise ended, whatever those rights might have been had the pier been continued in operation. Under these circumstances, the defendant has consented to pay the City the amount of these reserves and we require it to pay over the retained profits. The defendant insists, and quite properly, that it is not liable for any interest on these sums, since no accounting was ever requested or any demand made to turn over these profits and reserves until after the defendant had begun its original suit against the plaintiff. To require interest to be paid on these amounts after the plaintiff's long continued acquiescence would be to impose a penalty upon the defendant, which we are unwilling here to do.

(7) Three questions are here raised, all of which deal with the power of the court to give relief on the defendant's counterclaim for the payment of the moneys agreed to be advanced under the terms of the 1928 contract: (a) Can there be specific performance of an agreement to lend money? (b) What is the measure of damages for breach of a contract to lend money? (c) Is the contract so unconscionable as to be unenforceable in equity? None of these three questions should be answered in the affirmative. While it is true that as a general rule equity will not decree specific performance of a contract to lend money, nevertheless where the circumstances are such that specific performance is the only method by which relief can be granted, it is well within the power of the court so to order, *Jacobson v. First National Bank of Bloomingdale,*

129 *N. J. Eq.* 440 (*Ch.* 1941); affirmed, 130 *N. J. Eq.* 604 (*E. & A.* 1942); *Columbus Club v. Simons,* 110 *Okl.* 48, 236 *P.* 12, 41 *A. L. R.* 350 (*Sup. Ct.* 1925). There is here a valid contract that was entered into by the City with its eyes wide open. That the plaintiff may not now be receiving benefits which it considers equal to the contributions it is required to make, is not sufficient basis for refusing to compel performance. The plaintiff is still receiving and will continue to receive benefits from the project, the exact nature and extent of the benefits being difficult to accurately ascertain. If the City were now to be relieved of its obligations, the entire project would come to a halt and the rights of the citizens and third parties who had relied upon it would be irreparably injured, including the rights of the bond holders whose interests total over $2,400,000.

The judgment below in favor of the defendant is affirmed, and the judgment in favor of the plaintiff is modified to the extent that interest shall not be allowed on profits and reserves resulting from the operation of the Spruce Street pier.

*For affirmance and modification*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, and BURLING—6.

*For reversal*—None.