PAUL T. ONDERDONK, RALPH S. ALEXANDER, HELEN S. CRITES, BERTHA M. FRICK, FLORENCE HAY AND MARIE H. LUND, INDIVIDUALLY AND AS REPRESENTATIVES AND MEMBERS OF THE EXECUTIVE COMMITTEE OF MEADOW LAKES RESIDENTS FORUM, AN UNINCORPORATED ASSOCIATION, AND AS MEMBERS OF A CLASS CONSISTING OF MEADOW LAKES RESIDENTS, PAST, PRESENT AND FUTURE; WILLIAM LICHTENFELS, LAURA B. SMITH, GERTRUDE P. YOUNG, MARY L. FREEMAN, J. ARTHUR PLANTEROTH, JANE SMITH, MARGARET S. SMITH AND FRANK E. STEVENS, INDIVIDUALLY AND AS MEMBERS OF MEADOW LAKES RESIDENTS FORUM, AN UNINCORPORATED ASSOCIATION, AND AS MEMBERS OF A CLASS CONSISTING OF MEADOW LAKES RESIDENTS, PAST, PRESENT AND FUTURE, PLAINTIFFS–APPELLANTS, v. THE PRESBYTERIAN HOMES OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, NOT FOR PROFIT, ELLIS G. WILLARD, GEORGE A. VORSHEIM, MRS. ROBERT T. MANDLE, CLARENCE L. LECRONE, JOHN S. ROGGE, L. RODNEY BOAZ, C. LINCOLN McGEE, FRED APPLEBOHM, ROBERT C. THOMSON, MAURICE E. FARR, G. HALE BUCHER, HARRY T. TIEDACK, GEORGE A. SLEMMER, C. DICKEY DYER, JOSEPH H. BRADY, H. ROSS PINKNEY, DAVID L. CRAWFORD, JOHN E. SLATER, JR., JOHN A. VERMEULEN, FRED BENSON, MRS. JOHN K. HIGHBERGER, MRS. GUY H. HASKINS, MRS. GEORGE HERBERT, FRANK NOLT, ARTHUR CURTISS, AS PAST OR PRESENT MEMBERS OF THE BOARD OF TRUSTEES OF SAID CORPORATION, AND EDWARD HESS, DEFENDANTS–RESPONDENTS.

Argued October 7, 1980—Decided February 2, 1981.

---

*Robert C. Neff* argued the cause for appellants (*Shanley & Fisher*, attorneys).

*Garrett M. Heher* argued the cause for respondents (*Smith, Stratton, Wise and Heher*, attorneys; *Garrett M. Heher* and *Alexander P. Waugh, Jr.*, on the briefs).

*Chester Apy* submitted a brief on behalf of *amici curiae* American Association of Homes for the Aging and the New Jersey Association of Non-Profit Homes for the Aging, Inc. (*Abramoff, Apy, Fox & Zaro*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This suit involves the legal relationship of the parties to what is commonly referred to as a "life-care" contract. Defendant Presbyterian Homes of New Jersey (Homes), a non-profit corporation organized under Title 15 of the New Jersey Statutes,[1] operates a retirement community known as Meadow Lakes Village (Meadow Lakes) located in Hightstown, New Jersey. Plaintiffs, fourteen residents of Meadow Lakes, instituted this action individually and as representatives of a class consisting of the inhabitants of the community. The court determined that the class action could be maintained. *R.* 4:32–2. Of the 376 residents, 121 elected to be excluded.

The primary thrust of the complaint was the demand that Homes submit adequate periodic accountings to the residents. Plaintiffs also alleged that some improper charges had been included in calculating the monthly fee to be paid by the residents. In addition, plaintiff Paul Onderdonk sought to enjoin his eviction from Meadow Lakes and to recover damages under the Landlord Tenant Anti-Reprisal Act, *N.J.S.A.* 2A:42–10.10 *et seq.*, asserting that Homes attempted to oust him in retaliation for his activities on behalf of a residents' organization. Homes counterclaimed asserting that certain of the plaintiffs had maliciously interfered with its business operations.

The trial court ruled that plaintiffs were not entitled to any accountings or to any relief with respect to misallocation of

---

[1] Although Homes is a nonprofit corporation, it is not a charity. Accordingly, Homes' property has been held subject to municipal real estate taxes. *The Presbyterian Homes v. Division of Tax Appeals*, 55 *N.J.* 275 (1970).

funds. However, it held that plaintiff Onderdonk came within the umbrella of the Landlord Tenant Anti-Reprisal Act and awarded him $2500 in compensatory damages. It dismissed defendant's counterclaim.

Plaintiffs appealed and defendant cross-appealed. The Appellate Division reversed the award of $2500 damages to Onderdonk and affirmed the judgment in all other respects. 171 *N.J.Super.* 529 (App.Div.1979). We granted plaintiffs' petition for certification. 82 *N.J.* 303 (1980). For reasons stated herein the judgment below is affirmed in part and reversed in part.

## I.

The underlying facts are substantially undisputed. The Presbyterian Synod of New Jersey, a part of the Presbyterian Church, founded Homes in 1915. The power to elect, remove and replace members of the Homes Board of Trustees was vested solely in the Synod. Anticipating dissolution of the Synod in 1974, the trustees amended Homes' certificate of incorporation to provide that the trustees elect their successors. After this amendment, Homes had no further obligation to account to or report to the Presbyterian Church.

Homes constructed and operates a retirement community known as Meadow Lakes which consists of 329 attached one- and two-bedroom apartments, central dining and recreational facilities, and a 90-bed medical infirmary and nursing unit. The cost of construction was financed by a $10 million mortgage loan from Travelers Insurance Company and a $1.6 million loan from the Homes' Endowment Fund. The first occupants were admitted in 1965.

Homes advertised and distributed brochures to attract possible residents. The literature, besides noting that the minimum age requirement was 60, stressed that Meadow Lakes offered a "distinguished total living retirement community with complete medical/hospital care." It noted that residents would "enjoy the companionship of interested and interesting people"; that

"[a]bove all, the *complete* medical and hospital care provided at Meadow Lakes itself assures you of security from the threat of prolonged illness"; that medical care including the full cost of surgery and prolonged illness was covered by the monthly maintenance fee so that "you have absolute protection against the often unpredictable expenses of illness—and you live here at Meadow Lakes enjoying real peace of mind"; that three meals a day are provided; that each apartment is air conditioned; that all units are joined by air-conditioned and heated enclosed walkways; that wall to wall carpeting and drapes are provided; that common facilities include an auditorium, lounges, library, hobby rooms, a putting green, and a private lake stocked with bass and pickerel. The advertisements reflected the fact that Meadow Lakes was sponsored by the Presbyterian Synod. The literature also stated that the prices of the units ranged from $12,000 to $35,500 plus a monthly service charge of $205 to $245 per person. "The lifetime leasing fee ... assures you of a permanent home."

Arrangements to live in Meadow Lakes were formalized in a Residence Agreement (the Agreement). The Agreement required payment of a one-time capital fee [2] and a monthly rate. The monthly charges could be increased from time to time as "determined to be necessary" by Homes. Homes was obligated under the contract to provide living accommodations, meals and a range of services including utilities, linens, towels, medical, nursing and hospital care, general maintenance and parking. The monthly charge remained the same irrespective of a resident's transfer into the nursing facility or the extent of the medical and nursing care received.

The Agreement could be terminated, with or without cause, by either the resident or Homes upon 120 days written notice. Termination within 50 months would result in a refund, the

---

[2] The capital fees charged increased on June 1, 1973 to a range between $14,500 to $49,500 and in 1975 to a range between $15,000 to $59,000.

amount of which would be determined by prorating the fee at 2% per month. A minimum of 50% of the capital fee would be refunded if Homes terminated the contract without cause. However, if the resident died, there would be no refund.

All residents were members of Meadow Lakes Forum (Forum), an unincorporated association, which sponsored movies, lectures and other forms of entertainment. The Forum was also interested in any other matters which affected the welfare of the residents. Plaintiff Paul Onderdonk, a retired professional engineer, has been president of the Forum since 1969. He spearheaded the Forum's search for financial information, a search which was substantially motivated by large increases in the monthly rates.

From 1965 to 1974, the monthly charges increased more than threefold. When Paul Onderdonk and his wife executed their Agreement on November 29, 1965, their monthly rate was $430. By the time of trial in 1977, the Onderdonks' monthly charge was $1335. When an 18% increase occurred in 1966, the Executive Director of Homes wrote that there would "never be a time when there will be an 18% increase in rates." Yet increases in a 10-month period in 1973 and 1974 exceeded 43%. These increases engendered a sense of insecurity among some residents.

The residents were concerned that part of these monthly rate increases was due to subsidization of activities unrelated to Meadow Lakes. Homes operated a number of residential facilities in addition to Meadow Lakes. When Meadow Lakes was opened in 1965, Homes owned retirement facilities in Belvidere and Haddonfield. Between 1968 and 1974, Homes planned, purchased and developed low-income retirement communities in Asbury Park and Atlantic City, establishing separate nonprofit corporations for each. Homes also purchased, through a separate nonprofit corporation, a 115-acre tract of land in Washington Township.

The separate corporate entities had substantially the same trustees as Homes and the Homes executive offices and staff

located in Princeton serviced all the retirement communities. Plaintiffs believed that proper allocations of the executive office expenses had not been made so that Meadow Lakes was being charged with a disproportionate part of those costs and their monthly charges reflected expenses attributable to other operations.

Plaintiffs also were concerned that they were subsidizing nonresidents who use the Meadow Lakes medical center. Though first call for use of the Meadow Lakes medical center was reserved for the care and treatment of residents, it was also available to and was used by nonresidents. Plaintiffs feared that, from 1971 to 1974, the rate schedule for use of the medical facilities by nonresidents did not accurately reflect their proportionate share of the expenses because it did not include a fair share of the first mortgage debt service due the mortgagee, Travelers Insurance Company. The Travelers Insurance Company mortgage was secured by the entire Meadow Lakes property and buildings, including the medical structure. Thus a portion of debt service was allocable to the medical enterprise.

At the core of these concerns was the controversy over management's obligation to furnish the residents with periodic accounting information. Between 1968 and 1971, Homes had supplied monthly operating statements to the residents' association, the Forum. These statements were broken down into expenses and income chargeable to two categories, the medical center and to all other Meadow Lakes operations. The statements did not set forth the allocation detail with respect to executive offices. Not even these monthly statements were furnished after January 1971.

Homes' Board of Trustees had taken the position that the residents had no "proprietary interest in Meadow Lakes," that they had no right to share in management, and that if any were unhappy they were free to leave. However, the Board of Trustees recognized a "necessity for full and adequate communication between the residents and the trustees" and therefore in

1973 created a Meadow Lakes Advisory Council consisting of 15 members, only four of whom were elected by the residents. Apparently this committee was given monthly operating statements similar to those previously furnished to the Forum. In the course of discovery proceedings in this litigation, Homes' supplied audited reports for the years 1971 through 1975 and unaudited cash flow statements for 1973 through 1975. Defendant has also offered, in the course of these proceedings, to make its financial books and records available.

The decision to terminate Onderdonk's Agreement was the cumulative effect of the activity by the Forum in general and by him in particular. It culminated when the Forum's executive committee, of which Mr. Onderdonk was a member, investigated Homes' relationship with the Travelers Insurance Co. As a result of financial difficulties, Homes had been unable to meet its mortgage payments and had entered into a series of annual forbearance agreements with the mortgagee. Early in 1974, management was negotiating a new payment schedule. The residents' Agreements were subordinate to that mortgage and the Forum Executive Committee, disturbed by Homes' past inability to meet its mortgage commitments, created a special Forum committee to investigate the matter. The committee consisted of Onderdonk, Spencer Stevenson, a retired partner in the accounting firm of Haskins & Sells, and Ralph Alexander, a former professor of Business Administration at the Columbia University Graduate School of Business. They met with Travelers' representatives and expressed concern about the way in which Meadow Lakes was being managed and the substantial increases in monthly maintenance rates. Homes claimed that these meetings endangered the arrangements under discussion with Travelers.[3] Upon learning of these meetings Homes' executive director demanded that Onderdonk supply him with copies

---

[3]Following the meeting, Travelers refused to sign a supplemental agreement previously negotiated with Homes. After Homes filed suit for specific performance of the negotiated understanding, the parties settled the matter.

of all information and documents given to the mortgagee. Onderdonk refused and thereupon Homes' Board of Trustees served him with notice of termination of his Residence Agreement. The termination did not apply to his wife. After institution of this action, Homes consented to an interlocutory stay of the termination and subsequently waived all rights to enforce that notice of termination.

## II.

The nub of this case is whether there is a covenant implicit in the contract obligating defendant to furnish residents with meaningful financial statements. The Appellate Division rejected this claim because there was no demonstration "why the powers of equity should be used to write into a contract provisions which the parties themselves omitted or to modify terms to which they agreed, particularly where no overreaching has been shown." 171 *N.J.Super.* at 538. However, that principle does not reach plaintiffs' contention that covenants which may be implied to carry out the intent or purpose of the contract do not modify or alter its terms, but are in furtherance of what was intended.[4]

The Agreement does not expressly oblige defendant to account informally to the residents. The issues are whether the parties impliedly understood and agreed that the monies paid would be used only for certain purposes, and, if so, whether,

---

[4]Plaintiffs do not seek periodic formal court approved accountings. Thus it is not necessary to consider the three traditional grounds upon which equity would grant relief, *viz.*, existence of a fiduciary or trust relation, complicated character of the account, or need of discovery. *Messina v. National Store Co.*, 140 *N.J.Eq.* 312, 314 (Ch.1947); *Kenilworth Borough v. Graceland, etc., Ass'n*, 124 *N.J.Eq.* 35, 37 (Ch.1938); *Burdick v. Grimshaw*, 113 *N.J.Eq.* 591, 602–603 (Ch.1933). Plaintiffs, as stated in their reply brief before this Court, desire "an intelligible breakdown of expenses and disbursements, to be provided directly to them (without court involvement) in the same manner that such disclosure is routinely provided by parties to other commercial relationships where disclosure is a prerequisite to evaluating the fairness of an expenditure or a charge."

incidental thereto, defendant should supply financial data demonstrating it conformed to this agreement. ·

 Arrangements embodied in a contract may be such that the parties have impliedly agreed to certain terms and conditions which have not been expressly stated in the written document. *Bak-A-Lum Corp. v. Alcoa Building Prod.*, 69 *N.J.* 123 (1976); *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293 (1953). Some principles have been utilized to define those implications. Thus we have held that "[t]erms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written." *New Jersey Bank v. Palladino*, 77 *N.J.* 33, 46 (1978). See also *Renee Cleaners, Inc. v. Good Deal, etc., N.J.*, 89 *N.J.Super.* 186, 190–192 (App.Div.1965), certif. den. 46 *N.J.* 216 (1966). Moreover, in every contract there is an implied covenant of good faith and fair dealing. *Bak-A-Lum v. Alcoa Building Products*, 69 *N.J.* at 129–130 (1976); *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130 (1965). As a corollary to that proposition it is certainly reasonable to imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement. *Shultze v. Chevron Oil Co.*, 579 *F.* 2d 776 (3 Cir. 1978), *cert. den.* 439 *U.S.* 985, 99 *S.Ct.* 577, 58 *L.Ed.* 2d 657 (1979); *Association Group Life, Inc. v. Catholic War Veterans of U.S.*, 61 *N.J.* 150 (1972); 5 *Williston, Contracts* (3 ed. Jaeger 1961), § 670 at 159–160.

There are also some situations in which a condition will be implied "on grounds of fairness and justice." 3A *Corbin on Contracts* § 653 at 132–135 (1960). This thought was expressed in *Palisades Properties, Inc. v. Brunetti* as follows:

> Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship. *Fenning v. American Type Founders*, 33 *N.J.Super.* 167, 176–177 (App.Div.1954). See also 3A *Corbin on Contracts* § 653 (1960); 4 *Williston on Contracts, supra*, § 610B. In *Wood v. Lucy, Lady Duff-Gordon*, 222 *N.Y.* 88, 118 *N.E.* 214 (Ct.App. 1917), Justice (then Judge) Cardozo said (118 *N.E.*, at p. 214):

"The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed * * *." [44 *N.J.* at 130]

Perhaps *Marini v. Ireland*, 56 *N.J.* 130 (1970), best exemplifies when a condition may be implied. There a tenant asserted the landlord had an obligation to make repairs to an apartment in the absence of an express provision governing repairs in the lease. Since the object of the lease was to furnish the tenant with suitable quarters, the landlord had impliedly represented that the apartment was habitable and would remain so throughout the term. A covenant to that effect was held to be an implied term of the lease. Justice Haneman writing for a unanimous court stated:

In determining under contract law, what covenants are implied, the object which the parties had in view and intended to be accomplished, is of primary importance. The subject matter and circumstances of the letting give at least as clear a clue to the natural intentions of the parties as do the written words. It is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties. *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36 (1960); *Washington Construction Co., Inc. v. Spinella*, 8 *N.J.* 212 (1951); *City of Camden v. South Jersey Port Commission*, 4 *N.J.* 357 (1950); *McBride.v. Maryland Casualty Co.*, 128 *N.J.L.* 64 (E. & A. 1942). Terms are to be implied not because

"they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them * * * or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto. See 12 *Am. Jur., Contracts*, sec. 239; 14 *Am. Jur., Covenants, Conditions and Restrictions*, sec. 14." *William Berland Realty Co. v. Hahne & Co.*, 26 *N.J.Super.* 477, 487 (Ch.1953), modified 29 *N.J.Super.* 316 (App.Div.1954).

See also *Silverstein v. Keane*, 19 *N.J.* 1 (1955); *Cragmere Holding Corp. v. Socony Mobile Oil Co.*, 65 *N.J.Super.* 322 (App.Div.1961). [56 *N.J.* at 143]

Central to this inquiry of ascertaining what, if any, terms are implied is the intent of the parties. Intent may be determined by examination of the contract and in particular the setting in which it was executed. In *Atlantic Northern Airlines, Inc. v. Schwimmer*, Justice Heher pointed out that

[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. [12 *N.J.* at 301]

The intent of the parties in executing the Residence Agreements must be understood in the context of the social utilitarian purposes of life-care communities, such as Meadow Lakes.[5] These communities provide for most of the special needs of the elderly. They make available companionship of their peers, central dining, recreational and medical and nursing care facilities, in addition to eliminating the task of maintenance of their homes and environs. Homes held itself out to prospective residents in precisely that manner. It also assured them of security and peace of mind, perhaps the most vital assurances that an elderly retired person would seek.

In return for lifetime service, the resident makes a substantial capital contribution and then pays a relatively fixed monthly fee.[6] The monthly fee does not increase as a result of a transfer

---

[5]As the population has grown older with increased life expectancies, society has become more sensitive to the special needs of the elderly. See *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 71 *N.J.* 249, 266–273 (1976). Adequate medical care and housing for the elderly have become a pressing social problem addressed in part by state and federal legislative schemes. See, *e. g.*, 12 *U.S.C.A.* §§ 1701h–1, 1701s, 1701z, 1715v and *N.J.S.A.* 55:14I–1 *et seq.* Some religious and other groups, such as fraternal, labor and civil organizations, have been altruistically motivated to create life-care communities which combine housing and nursing care for the elderly. It has been reported that over 250,000 older Americans now live in these facilities. See American Association of Homes for the Aging, *Continuing Care: Issues for Nonprofit Providers* (1980).

[6]This arrangement is analogous to lifetime care arrangements under which an aged or infirm person assigns all his assets in return for a promise of lifetime care. The validity of such an arrangement has been upheld. See, *e. g., Fidelity Union Trust Co. v. Reeves*, 96 *N.J.Eq.* 490 (Ch.1924), aff'd 98 *N.J.Eq.* 412 (E. & A. 1925) (upholding contract between a 79-year-old woman and a Home which agreed to maintain her in return for a $300 fee plus any

into the medical facility where nursing care is provided. It has been said that this arrangement "offers a form of social insurance to the elderly; it preserves residential independence and removes the spectre of costly, and often premature, long-term institutionalization." Comment, "Continuing-Care Communities for the Elderly: Potential Pitfalls and Proposed Regulation," 128 *U.Pa.L.Rev.* 883, 885 (1980).

The trial court's findings, well-grounded in the evidence, refer to these representations:

> Prospective residents at Meadow Lakes have been solicited since prior to 1965 by brochures, advertisements, oral appeals from individuals and Presbyterian Churches. Separate advertisements have also been placed in newspapers to solicit patients at the medical facility. The advertisements emphasize a general feeling of "security" which would be available to retired persons at Meadow Lakes. Some of the promotional material contained the distinctive symbol of the cross utilized by the Presbyterian Church of the United States of America, as did the sign at the entrance to the facility which until 1976, read as follows:

### MEADOW LAKES

### "The United Presbyterian Church in the U. S. A. Synod of New Jersey"

> The brochures and promotional material stated, among other things, that residency at Meadow Lakes . . .
>
> *"will provide the highest possible degree of independence, security and peace of mind for your retirement."*
>
> and again,
>
> *"The lifetime leasing fee . . . assures you of a permanent home."*
>
> Defendants' promotional literature is replete with phrases such as "lifetime security," "independence," "privacy," "absolute protection against often unpredictable expenses of illness," and "real peace of mind."
>
> The literature uses as an example of the typical early occupant, a retired school teacher who purchased these "gracious retirement living" features for a capital fee of $12,000.00 and a monthly service charge of $205 to include food, medical care and maintenance. ("Don't worry about income or capital-draining illness—*complete* medical, hospital and nursing care is included," (emphasis in original).

---

property, real or personal, which she might acquire). See also Annotation, "Validity and construction of contract under which applicant for admission to home for aged or infirm turns over his property to institution in return for lifetime care," 44 *A.L.R.*3d 1174 (1972).

The importance to the individual of the services and security Homes offered cannot be overemphasized. Accommodation of housing space, dining and medical facilities and opportunities to interact with other residents form the heart of day to day living for senior citizens. Their incomes are generally modest and are derived in large part from pensions, social security and other fixed sources. Their concern for financial security is self-evident, particularly during inflationary periods. Therefore, upon payment of the capital fee, the most important financial feature of the agreement is the expectation that the monthly fees would remain relatively stable.[7] Moreover, since each Agreement is subordinate to the Meadow Lakes mortgage, it is very important to the residents that there be no foreclosure. Small wonder then that these residents would be anxious about substantial increases in monthly rates and the possible default on the mortgage.

Although there is no express limit in the Agreement on the use of the monthly fees, the only reasonable interpretation, and it is one which all parties accept, is that the income could be used only to pay for the services to be rendered. It was understood that the cost of those services might vary and the monthly rate would change by "such larger or smaller amount per month as may from time to time be determined to be

---

[7]This stability is enhanced by the spreading of costs contemplated in the Residence Agreement. The cost of operating Meadow Lakes is spread generally among the residents through payment of the monthly fee. While this may force one person to pay for part of a service which he may never use, it enables another resident who may be dependent on that service to enjoy it without bearing the full burden of its cost. Comment, "Continuing-Care Communities for the Elderly: Potential Pitfalls and Proposed Regulation," 128 *U.Pa.L.Rev.* at 891 n.42. Since capital fees are a one-time payment calculated to pay off Meadow Lakes' mortgage, their success is substantially dependent upon the projected turnover of residents. The scheme controls the average cost to the extent that those who outlive their life expectancy are balanced by those who die early. *Ibid.*; American Association of Homes for the Aging, *Continuing Care: Issues for Nonprofit Providers* at pp. 29–44, 65–67.

necessary." In view of Homes' status as a nonprofit corpora-
tion, the special relationship of the parties, the assurances of
financial as well as personal security for residents, and a failure
to warn prospective residents that their money could be used to
support Homes' other operations, it is reasonable to infer that
the parties intended that the monthly rate would be calculated
to meet only proper expense items related to the services
rendered.

 A necessary corollary of this restriction on Homes' use
of the income from Meadow Lakes' residents, particularly in
view of the assurances given the residents, is the obligation to
furnish each resident with meaningful financial statements.[8]
When under these circumstances one party to a contract possess-
es a monopoly on the information necessary for the monitoring
of the agreement, it follows, as a matter of logic drawn from the
subject matter of the contract itself and sound public policy,
that access to that information in a reasonable form must be
imputed into the contract by a court to ensure the performance
of the parties' critical understandings. This is especially true
here where the party without access to the information has
justifiably, and by invitation, reposed its trust in the other party
and is dependent upon the good faith of that party.

Such financial statements should disclose the types of funds
received and their application to expenses in sufficient detail to
enable residents to determine whether increases in the monthly
fees are reasonable. Thus, for example, when expenditures
involve the services of a joint 'employee, or use of shared
facilities, there should be adequate disclosure of the methodolo-
gy and computation utilized to apportion the expenses as well as

---

[8]For an opinion to the effect that a resident is not entitled to financial
statements and the methodology used in computing the monthly fee, see
*Grow v. Indiana Retired Teachers Community*, 271 *N.E.2d* 140 (Ind.App.1971)
(refusal justified in the absence of a confidential relationship).

their actual application. The Agreement implicitly requires such understandable financials.[9]

The American Association of Homes for the Aging, a national organization of nonprofit life-care communities, of which Homes is a member, recommends that a financial audit be made by an independent public accountant, not only for management, but also for residents so that it will "allay some fears and rumors about the home that are easily generated among residents and members of the community in which it is located." The Association also recommends that:

Audit reports also should be available to residents and potential residents of the home. The provider should make an effort to help residents understand the financial statements. Some people have no problem interpreting complicated financial information. For others, some type of simplified financial statement may need to be developed to assist in comprehension of the audit report. [American Association of Homes for the Aging, *supra*, at 70]

To the same effect see Comment, "Continuing-Care Communities for the Elderly: Potential Pitfalls and Proposed Regulation," 128 *U.Pa.L.Rev.* at 930, stating:

Complete financial disclosure to prospective and actual residents is one of the most important components of this Comment's proposed first-level regulatory system. It allows prospective and current residents and their advisors to evaluate fully the financial positions of a continuing-care community.

Some states have recognized the importance of financial disclosure and have enacted statutes requiring the filing of financial statements. See *Ariz.Rev.Stat.* § 20–1807 (Supp.1980); *Cal. Health & Safety Code* § 1782.5 (West 1979); *Colo.Rev.Stat.* § 12–13–126 (1974); *Fla.Stat.Ann.* §§ 651.026(4)(g) and 651.091

---

[9]Defendant has offered throughout these proceedings to make its books and records available and has submitted its audited financial statements for Homes and affiliates as of December 31, 1979 which it proposes to distribute to the residents. These are combined statements which include entities such as Atlantic City and Asbury Park in addition to Meadow Lakes. However, these data do not provide a breakdown and explanation of how the administrative and general expenses have in fact been allocated. Nor is there provided the computation of the nonresident charges for use of the medical facilities or the allocation of expenses between the medical and residential operations at Meadow Lakes.

(Supp.1980); *Md.Ann.Code* art. 70B, § 10b (Supp.1980); *Mich. Stat.Ann.* § 13.1301(22)(3) (Supp.1980); *Minn.Stat.Ann.* § 256B.30 (West Supp.1980). See also H.R. 4170, 95th Cong., 1st Sess. (1977) (would require all federally assisted continuing care facilities to be audited at least once a year and make the reports available, upon request, to each individual with whom they have entered into a continuing care contract). New Jersey provides fairly extensive regulation of "residential health care facilities" primarily geared to licensing and service standards. See *N.J. S.A.* 30:11A–1 to –12; *N.J.S.A.* 26:2H–1 to –52; *N.J.A.C.* 8:43–1.1 to –7.1, as amended by 12 *N.J.R.* 394(b).[10] Our holding herein is consistent with this legislative policy as well as that of the industry.

## III.

In addition to their request for periodic disclosure, plaintiffs advance two claims of alleged misappropriation of funds. First, they assert that management time expended by Homes' executive staff on enterprises in Asbury Park and Washington Township was charged to the Meadow Lakes' account, and thus found its way into the residents' monthly fee. Both the trial court and the Appellate Division found that any expenditures which might have been improperly charged to Meadow Lakes were minimal at best and that plaintiffs' damage computations were based on budgeted, not actual, figures. These conclusions are supported by substantial credible evidence and will not be disturbed. *State v. Johnson,* 42 *N.J.* 146 (1964).

The second claim involves the per diem rate charged to nonresidents for use of the medical center. In general the method of calculating the rate was to compute all expenses properly allocable to operation of the medical facility, including

---

[10]Defendant contends that Meadow Lakes is not covered by these statutes. Since these statutes were passed after this suit was instituted and the issues have not been briefed or argued, we express no opinion as to their applicability to Meadow Lakes.

approximately $130,000 to $140,000 toward amortization of Meadow Lakes' mortgage. The total expenses, as budgeted, were divided by an estimated number of patient days to determine the daily rate for each patient occupying a bed in the facility during the coming year. Adjustments were made between private and semi-private room rates. The charge was the same for residents and nonresidents. Nonresidents paid as they would any hospital bill. With respect to residents, a portion of the monthly fee of all residents, based on projected occupancy of the facility by residents, was allocated for medical bills incurred by residents. During 1971–1974, a price freeze prevented the medical center from increasing its daily rates to the extent needed to cover its budgeted share of the mortgage payments. For these years the medical center paid only $118,529, instead of about $535,000, toward the mortgage interest.

As the trial court and Appellate Division pointed out, Travelers Insurance Co. forbore part of the mortgage payments during these years. However, the forbearance agreements relieved only the obligation to repay principal. Homes was still required to pay interest on the outstanding balance. Since the medical facility was budgeted to pay 20% of the mortgage payments and accounted for only 4.2% of the total amount actually paid by Homes, it failed to bear its proportionate share of these interest payments. The amounts not contributed by the medical facility were paid out of capital fees collected from incoming residents. Accordingly the deficiency in the medical facility's contributions did not cause an increase in the residents' monthly fees. As the trial court and Appellate Division stated, if Homes had been able to charge the higher daily rate, thereby enabling the medical facility to pay its share of the mortgage obligations, the monthly fees payable by the residents would have been higher than those actually paid. Since plaintiffs have failed to prove damage in excess of this savings in monthly fees, we affirm the trial court and the Appellate Division's finding that plaintiffs sustained no damage.

## IV.

The final claim in this case involves the threatened eviction of plaintiff Paul Onderdonk from Meadow Lakes. The Appellate Division held that the relationship between Onderdonk and Homes was not one of landlord and tenant so that the remedy under the Landlord Tenant Anti-Reprisal Act, *N.J.S.A.* 2A:42–10.10, was not available. It also held that in any event plaintiff had not proven any actual damages and the $2500 money judgment awarded by the trial court could not stand.

We agree with the Appellate Division that Onderdonk's claim cannot be sustained because of his failure to prove damages. Homes waived its right to enforce the termination notice and Onderdonk has remained a resident. There is no evidence that he suffered any injury. In the absence of damages, this claim must fall.

The parties have vigorously disputed the applicability of the Landlord Tenant Anti-Reprisal Act, *N.J.S.A.* 2A:42–10.10, the argument centering on whether the Residence Agreement created a landlord-tenant relationship. See *American National Bank & Trust v. Presbyterian Homes*, 148 *N.J.Super.* 465, 473–477 (App.Div.1977), holding that the Agreement was not a lease under the Retirement Community Full Disclosure Act, *N.J.S.A.* 45:22A–1 *et seq.* We find it unnecessary to pass upon the issue in view of our finding that no damage has been proven.[11]

## V.

Homes is under a contractual obligation to furnish its residents with meaningful annual financial statements disclosing the amounts and sources of Meadow Lakes' income and expenditures in reasonable detail. When such income or expenditures

---

[11]Homes may be a "residential health care facility" within the scope of *N.J.S.A.* 30:11A–1 *et seq.* and, as such, subject to the anti-retaliation measures of that act. See *N.J.S.A.* 30:11A–10. This statute became effective 180 days after February 28, 1980. See also *N.J.S.A.* 55:13B–18, –14, and –19(k).

involve third persons, the financial relationship, including allocation methodology, computations and figures, should be disclosed. To be fully significant the data supplied should be adequate to enable the residents to determine and understand whether the sources and expenditures are in accordance with the Agreement. It would be helpful, of course, if a representative of Homes were available to explain and answer for the residents any questions with respect to those statements. Such assistance would accord with the policy expressed by the American Association of Homes for the Aging. Therefore, we reverse that part of the Appellate Division's judgment that denied plaintiffs' request for disclosure.

With regard to the claim for damages because of misappropriated funds, we find that plaintiffs' proofs do not establish actionable claims because of failure to prove damages with respect to the alleged improper allocations of executive expenses and nonresident medical care costs. We also find that the Landlord Tenant Anti-Reprisal Act, even if applicable, was not violated because no damage was shown.

Judgment of the Appellate Division is affirmed in part and reversed in part. We do not retain jurisdiction.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, SCHREIBER, HANDLER and POLLOCK—6.

*Opposed*—none.