### KENNERLEY v. SIMONDS et al.

(District Court, S. D. New York. December 28, 1917.)

No. 177.

1. COPYRIGHTS ⬩⟾55—INFRINGEMENT—WHAT CONSTITUTES.

S., having composed a book entitled "The Great War," in two volumes, "The First Phase" and "The Second Phase," contracted with complainant for publication of the work. The contract declared that S. assigned to complainant the work, and that complainant should have the first refusal of any continuation thereof. Thereafter S. contributed to a four-volume history of the world war published by his codefendants. Defendants advertised that S. was the author of their history and lauded him as a military critic. In writing of the causes of the war, S. treated of the same historical events in each work; but his treatment and comments on various military operations dealt with in both works differed. *Held* that, though there was some similarity in the treatment of historical events in the two works, the subsequent book was not a violation of complainant's copyright, for it is impossible for a historian, writing twice on the same subject, to ignore important historical events, though treated in the first work, and an author, though a prior work be his own, is entitled to the use of information or material which may have been obtained from common sources, either published or unpublished, the test being whether the latter work was new and original, and furthermore that an author, after writing for one publisher concerning recent historical events, accords them a different treatment in a subsequent work, does not show an invasion of the first publisher's copyright.

⬩⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. INJUNCTION ⬡⟾58—NEGATIVE COVENANTS—"REFUSAL."

Where the contract between S. and complainant provided for payment to S. on a royalty basis, and at the time he entered into such contract he had not acquired great reputation as a war writer, the provision in the contract that complainant should have the refusal of any continuation of the history, which must be treated as an option, the word "refusal" being so defined, that provision cannot be construed as amounting to a negative covenant, warranting the issuance of an injunction restraining S. from writing for any other publisher on the theory that his services were unique and extraordinary, for such a covenant must be clearly understood by the parties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Refusal.]

3. INJUNCTION ⬡⟾58—CONSTRUCTION—NEGATIVE COVENANT.

A court of equity will infer a negative covenant in a contract of employment, where equity and justice require; but such covenant must be clearly implied and understood by all the parties, and should not be implied unless indispensable to carry out their intention.

4. SPECIFIC PERFORMANCE ⬡⟾73—NEGATIVE COVENANT.

A negative covenant in a contract of employment will be enforced only where the services are especially unique or extraordinary, as in the case of singers, artists, authors, and the like, and a clear contract is shown.

5. SPECIFIC PERFORMANCE ⬡⟾57—OPTION CONTRACTS—MUTUALITY.

Where a contract between a publisher and an author merely gave the publisher an option to acquire the author's later work, and did not bind the publisher to purchase it, the option contract cannot be enforced as a negative covenant in a contract of employment, because not mutual.

6. TRADE-MARKS AND TRADE-NAMES ⬡⟾93(3)—UNFAIR COMPETITION—WHAT CONSTITUTES.

A former newspaper man wrote a history of the world war for complainant, which was advertised and greatly enhanced the writer's reputation. Thereafter he contributed to a history of the world war published by defendants, which included contributions from many other celebrities. Defendants' history, the title of which was similar to that of complainant, was different in appearance and was in a greater number of volumes. *Held* that, though defendants' advertisement falsely represented that it was the only history of the war written by the newspaper man, complainant's assertion of the unfair competition was not established; it not appearing that there was any fraud or deceit whereby defendants' history was held out to the public as that of complainant and the name of the book never being a trade-mark.

In Equity. Suit by Mitchell Kennerley against Frank H. Simonds and others. On motion for preliminary injunction. Injunction denied.

Rosenberg & Ball, of New York City (James N. Rosenberg, of New York City, of counsel), for complainant.

Kellogg, Emery & Cuthell, of New York City (Dean Emery, of New York City, of counsel), for defendants.

MANTON, District Judge. Complainant moves for a preliminary injunction, seeking to enjoin an alleged infringement of copyright. The prayer asks for equitable relief, based upon contracts made between the complainant and the defendant Simonds.

Simonds is a writer, and has made considerable reputation, first

writing for daily newspapers, the Sun and the Tribune, of the city of New York, and later composing a book entitled "The Great War" in two volumes—"The First Phase" and "The Second Phase." He contracted for the publication of these books with the complainant, a publisher, under date of September 21, 1914, and December 16, 1914. He later wrote, for the defendant Doubleday, Page & Co., in a book series to be published in four volumes, called "History of the World War." It is this latter effort that the complainant complains of, claiming it violates the plaintiff's copyright and contract obligations of Simonds. A provision of the contract of September 21st provides:

"The author hereby grants and assigns to the publisher the work or book the subject or title of which is 'The European War,' including all serial rights," etc.

And the further provision:

"The publisher shall have the first refusal of any continuation of this history of 'The European War.'"

The contract of December 16, 1914, provides:

"The author hereby grants and assigns to the publisher a work or book, the subject or title of which is 'The Great War—Volume 2.'"

And it is further provided that:

"From time to time the publisher shall have the first refusal of any continuation of this history of 'The Great War' on the same terms."

It is said that the publication of books by Simonds' codefendants is a violation, not only of complainant's copyright, but of the terms of the contract above referred to, and therefore complainant presents three questions:

(1) Does defendants' publication invade complainant's copyrights?

(2) Are the clauses in the contract giving the complainant the first refusal on any continuation of Mr. Simonds' history of "The Great War" negative covenants, with the consequent right to complainant to an injunction against Mr. Simonds writing for others any continuation of "The Great War," and an injunction against any others from publishing any such continuation?

(3) Is the advertising by the defendants of their publication, in which they say that theirs is the only "History of the Great War" written by Mr. Simonds, such evidence of unfair competition as to entitle complainant to an injunction against further acts along these lines by the defendants?

[1] Complainant copyrighted the first book published, "The Great War—The First Phase," and later copyrighted the book, "The Great War—The Second Phase." The book has been placed upon the market at considerable expense for advertising. The defendants have advertised their book, "History of the World War," placing in conspicuous type the name of Frank Simonds as its author, and stating that:

"He is the man who prophesied this war," etc. "He is the newspaper man who studied military strategy for eighteen years. * * * He has a style that made him famous. He is the man who spoke to America, but whom Europe heard. He is the editor of the New York Tribune, who is read by

European general staffs. * * * He is the one great historian whom this war has produced."

It is this advertisement, and the language employed, that constitutes the claim of unfair competition, as well as the violation of copyright. The ninth paragraph of the bill of complaint alleges that some portions of the book have been published in the New York Evening Sun; that the Sun's copyright in and to such portions was duly acquired by and is owned by the complainant.

The defendants raise the objection that nothing is said in the moving papers to show how the publishers of the Evening Sun took the necessary steps to secure statutory copyright, but there is a letter, addressed to the complainant from the editor's office of the Sun, stating:

"The Sun will at any time execute formal assignment in the matter of copyright on Mr. Simonds' editorials. If you will have the article prepared, I will attend to it at once."

However, passing the question of the complainant's title, I will consider the claim of violation of the copyright.

The complainant alleged, in his moving papers, that the defendants' book "is closely similar in substance, content, plan of arrangement, and method of treating this subject, and it is another version or revision of complainant's volumes, and is a rewriting thereof, which deals with the subject-matter, uses the same general arrangement, and contains the same points of review," etc., and as illustrative of this attention is called to volume 1, pages 9 to 15, chapter 1, of complainant's book, entitled "Assassination of the Archduke," beginning chapter 2 of the European Crisis, which described the immediate causes which led to the war, the theory of causes being the cumulative force of conflicting interests as typified in the European crisis preceding the war, to wit, the annexation of Bosnia and Agadir and the conference that followed the defeat of Turkey and Tripoli by Italy, the two Balkan wars resulting in the thwarting of Servian aspiration for a window on the sea, and the creation of irredemption in Servia.

The author nowhere takes the common stand that Germany willed the war and that it was her desire for alliance and expansion. In defendants' book, the same theory of cause is written in chapter 2, entitled "From Tangier to Armageddon." The consequences and causes in complainant's book are Bosnia, Agadir, the conference following Agadir, Tripoli, and the first and second Balkan wars. This is written of in the defendants' book under the title "Bosnia: The Second Gesture," and in somewhat similar phrase. The occupation of Bosnia by Austria, as thus described, is given as one of the leading causes for the present war, and it is clear in each book that at the critical moment Germany made a military threat, that this threat was directed at Russia, rather than the other Allies, and that this had the direct result of promoting Russian intrigue in the Balkans. There is similarity of reason and writing in the description of the Agadir incident, following the Bosnia affair. The reference to the German disaster, and Germany's turn to yield, and Germany's prestige being terribly shaken, is similar in reason, although couched in different language, and there is a paral-

lelism in dealing with the first Balkan war and the second Balkan war, all of which is in analyzation of the events which led to the present war, stretching over a period of years preceding the war. The 27 pages in defendants' book which are devoted to an analysis and explanation of the earliest movements in European history are more than an amplification of the subject as given in the complainant's book. I consider it new matter.

The author, in each case, makes a statement of historical facts as to the objection made by France, Great Britain, and Russia to the annexation of Bosnia by Austria, and reference to the interposition of Germany at the critical moment on the side of Austria. It cannot be perceived how a historian can deal with this matter differently, if he is attempting to state historical facts; and the same use of a metaphor would, indeed, argue against the contention that the author was attempting to cover an obvious copying. The reference to the memorable speech of Lloyd George, with the corresponding statement in defendants' book, is but a repetition of historical material, now common to all the world. The same is true of the treatment of the first and second of the Balkan wars, and unless the writer, a historian, may never write twice on the same subject, I fail to see how he might avoid similarity of expression in recitation of historical material.

Reference to the story of the drive of the Germans under Kluck against the English, under Sir John French, in connection with the German advance in northern France, in the early period of the war and before the battle of the Marne, are not similarly described in both books, and the author's comments and criticisms of each general are not similarly described; and this is quite natural, in view of the lapse of time between the two writings. The reference to the comment and effect upon the European situation after the battle of the Marne, and the importance of the battle of Ypres, and the particular stress placed upon each battle by the writer, was to be expected, for each is now considered a turning point in the history of this war. If, as a result of study and observation, after writing for complainant about these battles, he wrote differently, as he seems to have done, in the defendants' book, the author has not violated complainant's copyright.

Under the authorities, I do not think that a showing of copyright violation has been made out. There are 80 chapters in the complainant's book. Of these, 18 are selected for comparison, and their chapter headings are referred to as similar; but this was necessary, as descriptive of the occurrences. The test laid down in Rooney v. Kelly, 14 Irish Common Law, New Series, 158, is whether such other book may, in some respects, be similar to the author's former book, and the question would be whether such other book should, under all the circumstances, be fairly considered as a new and original work, or merely as a reproduction, in whole or in part, of the former book.

Drone on Copyright says (page 417):

"An author is entitled to the use of information or materials which may be obtained from common sources, either published or unpublished. * * * But there is nothing in the law of copyright to prevent any person who has obtained common materials from the original sources from using them in substantially the same manner and for the same purpose as they have been

previously used, provided the arrangement is his own and is not servilely copied from the work of another."

Judge Story, in Emerson v. Davies, 3 Story, 768, Fed. Cas. No. 4,436, said:

"It may be laid down as the clear result of the authorities, in cases of this nature, that the true test of piracy or not is to ascertain whether the defendant has in fact used the plan, arrangements, and illustrations of the plaintiff as the model of his own book, with colorable alterations and variations only to disguise the use thereof, or whether his work is the result of his own labor, skill, and use of common materials and common sources of knowledge, open to all men, and the resemblances are either accidental or arising from the nature of the subject; in other words, whether the defendant's book is, quoad hoc, a servile or evasive imitation of the plaintiff's work, or a bona fide original compilation from other common or independent sources."

There is no reason why there should be a different rule, where the same author writes on the same subject, than the rule where two different authors, working from sources available to all, write on the same subject, in the absence of some provision in the contract of employment which forbids it. In either case, the latter book must not represent unfair appropriation of the labors that went into the first book.

[2-4] The provision of the contract of employment above referred to is claimed by the complainant to amount to a negative covenant, and it is said that Simonds has become a unique character by reason of his reputation, and that the services thus to be rendered by him are of such unique character as would warrant the injunctive relief for breach of this negative covenant.

The defendants' claim that the contract grants an option on the services of Simonds to the complainant seems to be concurred in by the complainant. A refusal is an option (English Law Dictionary); is often used to indicate an option (Bouvier's Law Dictionary). The defendants have published one volume, and signified their intention of publishing other volumes, of the History of the World War, and it is advertised that Mr. Simonds will contribute to succeeding volumes. A court of equity will infer a negative covenant in a contract where equity and justice require. Harper v. Klaw (D. C.) 232 Fed. 609. But such covenant must be clearly implied and understood by all the parties. It should not be employed, unless it is indispensable to carry the intention of the parties into effect. D. & H. Canal Co. v. Coal Co., 8 Wall. (75 U. S.) 276, 19 L. Ed. 349. Implied promises are to be cautiously, not hastily, raised. Genet v. D. & H. Canal Co., 136 N. Y. 608, 32 N. E. 1078, 19 L. R. A. 127. It should be founded upon clear contract, and the court should not interfere by injunction, unless a clear contract is shown. Warne v. Rauledge, L. R. 18 Equity, 497. It is only in a case where the services are especially unique and extraordinary, as in the case of singers, actors, artists, and the like, that equity will interfere to restrain, by injunction, a violation of the restrictive covenant. Strobridge Litho. Co. v. Crane, 58 Hun, 611, 12 N. Y. Supp. 898; Pomeroy's Equity Jurisprudence, vol. 4, § 1344.

The moving affidavit shows that Mr. Simonds was an editorial writer on The Sun, not known to the general public when he published

"The Great War—The First Phase." It is claimed that after the publication of this book, through the efforts of the complainant, he became the leading writer on the war. It was prior to the publication of "The First Phase" that the contract of September 21, 1914, was made. At the time of the making of the contract of December 16, 1914, he had only acquired such fame as the publicity of the book "The Great War—The First Phase" gave him from October 24th to December 16th. From this it cannot be said that the parties, at the time they entered into the contract, had in mind the unique and extraordinary character of Simonds' services, so that they must be presumed to have intended to make his services subject to a negative covenant. While he may have reached fame, indicating special ability as a historical writer, at the time of this decision, that is not the test. There is not sufficient showing, at least now, which would warrant inferring a negative covenant. Hammerstein v. Mann, 137 App. Div. 580, 122 N. Y. Supp. 276; Star Co. v. Press Pub. Co., 162 App. Div. 486, 147 N. Y. Supp. 579. The contracts provided that the author should receive 10 per cent. of the published retail prices on the first 2,500 copies sold, 12½ per cent. on the next 2,500, and 15 per cent. thereafter. Contracts which contemplate service of a unique character are usually fixed in lump sums, and in the absence of some express covenant one should not be inferred here.

[5] There is also a lack of mutuality which forbids the enforcement of a contract by injunction. If the claim of complainant is correct, Simonds is bound to sell any continued service to complainant; but it is not pretended that Kennerley is bound to buy it.

[6] So far as appearances are concerned, there is nothing which would indicate a just claim of unfair competition. The titles are different; the appearance of each book is different. As counsel for the defendants claims, there will be, if there are not already, a number of books written as history of this war, which will be derived from the same common sources dealing with the same subject-matter. Similarity of such histories and references therein must be expected, and cannot rise to the degree that will sustain a charge of unfair competition.

The advertising matter recites that the proposed history is to be made up of at least five volumes, contributed to by Viscount Bryce, Ex-President William H. Taft, Orville Wright, Hudson Maxim, Ian Hay, Winston Churchill, McConnell, the American aviator, and Stephane Lauzanna. The statement in the advertising that defendants' book is the only history of the war written by Simonds is not truthful; but this, standing alone, is not sufficient. There is no such physical resemblance of the two articles' imitation of advertising and sales resulting from such advertising as to constitute words or acts which either deceive, or which are well calculated to deceive, the public. The fraud necessary to sustain a claim of this character must be proven. It cannot be inferred from similarities not calculated to mislead the purchaser. The action may be maintained where it appears that the defendant is destroying or attempting to destroy an honest business by dishonest means. Kipling v. Putnam, 120 Fed. 631, 57 C.

C. A. 295, 65 L. R. A. 873. The name of a book is never a trademark and cannot be. Deceit is an indispensable element of unfair competition. There must be shown an intention to palm off defendants' book for the plaintiff's book. The burden is on the complainant to make clear and satisfactory proof of fraudulent intent and deceit. Similarity of chapter headings, or what would be the same thing, alone would not support the charge of unfair competition.

Upon the showing at this time, where a preliminary injunction is sought, I am satisfied that the complainant has not made out a case which warrants a court in equity interfering with the defendant Simonds' personal liberty, or with the defendants' publication and sale of the work.

The motion will therefore be denied.