31 N.J. Super. 87 (1954)
106 A.2d 27
ARTHUR M. COOPER, STANLEY FRANKEL AND MAPLE SHADE DEVELOPMENT COMPANY, INC., PLAINTIFFS,
v.
THEODORE J. KENSIL, CORONET CONSTRUCTION CO., BERLIN GARDENS, INC., BROKERS MORTGAGE SERVICE AND D.V.M. INVESTMENT COMPANY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 2, 1954.
*89 Mr. Louis B. LeDuc, attorney for plaintiffs.
Mr. George D. Rothermel and Mr. Samuel Kalikman, attorneys for defendants.
HANEMAN, J.S.C.
Plaintiffs herein seek the specific performance of an agreement, under the terms of which they were allegedly afforded an option by the defendant Kensil to participate in future projects for the construction and sale of dwellings. The facts in connection herewith are as follows:
Under date of April 1, 1952 the plaintiffs and the defendant Kensil entered into an agreement which contemplated a housing development by a corporation organized by them and known as Maple Shade Development Co., Inc. This corporation will hereafter be referred to as "Maple Shade" and the said agreement as "Maple Shade contract." The agreement proceeds at considerable length to set forth some of the details of the manner in which the said parties were to proceed, including provisions for the following:
"(1) Price to be paid for stock (2) Loan-amount, type, term, interest, etc. (3) Buy-out of person having an existing interest (4) Status of $1,500.00 judgment note (5) Make-up of Board of Directors (6) Officers (7) Three sub-paragraphs on duties and salaries of officers (8) Signatures on checks (9) Four sub-paragraphs dealing *90 with non-assignability of stock and stock options (10) Restrictions on salaries until note to plaintiff Frankel is paid off (11) Agreement to transfer tax-title liens (12) The clause at issue in this suit (13) Covenant as to voting stock (14) Receipt of copy of agreement."
Paragraph 12 of said agreement reads as follows:
"12. That all of the parties to this Agreement agree that if any of them shall enter into any subsequent project of constructing and selling dwellings, either alone or with others, he or they shall first offer to the other parties to this Agreement the option of participating in such subsequent project. And each of the parties to this Agreement shall have the right to so participate to the extent of his then existing stockholding interest in the Maple Shade Development Company, Inc."
Subsequent to the Maple Shade contract, and on or about January 1953, the defendant Kensil proceeded to enter into a new housing development project commonly referred to as "Berlin Project," with persons other than the remaining parties to said Maple Shade contract. It does not appear from the testimony whether this project was promoted and sponsored by the said Kensil or whether his participation therein resulted from the overtures of and negotiations by other parties. However, it does appear that the option for the land involved in the Berlin Project was obtained by a third party, to wit, one Ridgway, and not by Kensil.
The primary question with which we are here confronted is the construction of the above quoted paragraph 12.
The plaintiffs urge that in effect all of the four parties to the Maple Shade contract agreed that either (1) where any of them contemplated entering into "any subsequent project of constructing and selling dwellings" by himself, he must first accord the other of said parties the opportunity to participate in any such new "project" in one-quarter shares and obtain their refusals before he had the right to proceed therewith solely, or (2) where any of them contemplated entering into any such "subsequent project" together with strangers to said Maple Shade contract, he must first accord the other of said parties the opportunity to participate in any such new "project" in one-quarter shares in his fractional interest *91 therein before he had the right to proceed therewith in association with any strangers.
It is apparent that the clause here involved is inartistically worded. Paraphrased, the plaintiffs contend that they are entitled to a "first refusal" in all or any part of such subsequent "project" and it is of no moment whether the new "project" had its genesis in the mind of one of the parties to the Maple Shade contract or whether it was promoted by strangers thereto and he was invited by them to join with them.
The general rules for the construction of words as used in contracts has been often and ably expressed by our courts. In Bullowa v. Thermoid Co., 114 N.J.L. 205 (E. & A. 1935), the court said, at page 209:
"The ascertainment and effectuation of the intention of the parties, as manifested by the language employed and the objects to be accomplished, are the ends to be served in the interpretation of written agreements. The standard of interpretation of an integrated agreement, such as this, is, with certain qualifications not here pertinent, the meaning that would be attached to the integration by a reasonably intelligent person. Corn Exchange National Bank and Trust Co. [Philadelphia] v. Taubel, 113 N.J.L. 605, 607, 175 A. 55. The general purpose of the contract, as expressed by the words and other manifestations of intention employed, when read and considered as a whole, is the thing sought. Effect, if possible, will be given to all parts of the instrument, and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable; and if this is impossible, a construction which gives effect to the main apparent purpose of the contract will be favored. The freedom of construction permissible is, however, necessarily limited by the principle that unexpressed intention is of no legal effect."
In S.P. Dunham & Co. v. 26 East State St. Realty Co., 134 N.J. Eq. 237 (Ch. 1943), the court said, at page 243:
"It is elementary that words are utilized to symbolize and communicate an idea. Often they may import both a capacious as well as a limitable concept. A court must ascribe to them that interpretation which, under all the facts and circumstances, seems to subserve and not to subvert the actual intention of the parties who chose them as expressive of their mutual intentions. The cardinal rule in the interpretation of contracts, whether at law or in equity, is to ascertain and effectuate the common intention of the parties unless *92 to do so transgresses legal principles or public policy. The intent, if lucidly expressed and distinctly manifested by the language used in the writing, must be accepted as determinative of the contractual obligation."
See also Zurich General Accident & Liability Ins. Co., Ltd., v. American Mutual Liability Ins. Co., 118 N.J.L. 317 (Sup. Ct. 1937); Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953).
Words must generally be given their ordinary and popularly accepted meaning in the absence of anything to show that they were used in a different sense. Proprietors' Realty Co. v. Wohltmann, 95 N.J.L. 303 (Sup. Ct. 1921); Lucas v. U.S. Fidelity & Guaranty Co., 113 N.J.L. 491 (E. & A. 1934); S.G. Young, Inc. v. B. & C. Distributors Co., 23 N.J. Super. 15 (App. Div. 1952); LeDuc v. J.T. Baker Chemical Co., 23 N.J. Super. 28 (App. Div. 1952).
The entire clause constitutes an option.
"An option is a term of business usage rather than of strictly legal nomenclature, and has frequently been used to include indiscriminately both binding conditional contracts and mere unsealed offers without consideration. Both are offers, but the latter kind has, of course, no binding force either at law nor in equity. On the other hand, an option for which consideration has been given is both an offer and also a unilateral contract. The only difference in the two kinds of offers is that one is revocable, the other is not. In either case when the offer is seasonably accepted a new contract, usually bilateral, arises, and it is, strictly speaking, this contract which is specifically enforced. Failure to recognize this has sometimes caused confusion." 5 Williston, Contracts (rev. ed. 1936), sec. 1441.
The questioned paragraph should be regarded as what has become recognized commercially as a "first refusal," which term has been held an option. Kennerley v. Simonds, 247 F. 822 (D.C.S.D.N.Y. 1917).
The keystone to a construction is to be found in the words "either alone or with others * * * first offer * * * the option of participating" and the last sentence of paragraph 12.
What does the word "first" mean? It cannot be considered redundant. "First" means before or anterior to; *93 "(1) preceding all others; foremost;  used as an ordinal of one; as (a) earliest in time or succession;  said of either the past or future; as, he was the first to come; the first train leaves at one; my first voyage; the first year of independence. Foremost in position; in front of, or in advance of, all others; as first in the race." Webster's New International Dictionary (2nd ed.)
It must mean, in the sense here used and in the light of the entire clause, that a party to the Maple Shade contract must extend to the other parties to said contract an opportunity to join with him in any new undertaking conceived by him before he may proceed either solely in said new undertaking or with other and new associates. Weight is added to this conclusion by the use of the words "if any of them shall enter * * * either alone or with others, into any subsequent project." The use of this language would connote that if any of the parties should initiate such a project, the remaining parties shall have the "option," i.e., election, whether to "participate" or to refuse to participate. The word "option" as here used does not have the legal significance ascribed by Williston, as above quoted. It means  "(1) the exercise of the power of choosing; choice; (2) power of choosing; the right of choice; (3) that which is offered for choice or which is chosen." Webster's New International Dictionary, (2nd ed.).
The words "first offer" denote a control of the entire project. In effect, this clause provides that if any party to the primary contract contemplated promoting a subsequent project, the other parties shall be accorded an opportunity to determine whether they desire to join with him before he has the right to solicit other aid or to undertake the same alone. It means that where the new undertaking is controlled by any of the parties to the Maple Shade contract, he must offer the same to the balance of those interested before seeking new associates. Provisions for such a result are not uncommon in agreements for housing and land developments.
*94 It is conceivable that an interest in a project originated and promoted by strangers could be offered to one of the four stockholders of Maple Shade  that the originator of such a project might want one or less than all of those interested in Maple Shade as associates and not want the balance of such stockholders. Was it the intent of this agreement to foist such undesirables upon the new syndicate or prevent the persona grata from entering into such a new contract? The former it could not do and the latter was not the clear intent of the parties.
It is, therefore, here held that the clause in question required the defendant Kensil to offer the other parties to the Maple Shade contract an opportunity to participate in a subsequent project only where the latter originated with him and was controlled by him in the first instance, before he could seek other associates. Since the plaintiffs have not proven such required facts, they have failed in a vital particular to carry the necessary burden.
The second sentence strengthens this conclusion. It provides for a participation in the entire new project to the same extent as in the old. It is noteworthy that no provision is made for a participation in a fractional share of a new project. If it did not mean this it meant nothing, as the terms are too uncertain. The alleged option, to be enforceable, is not sufficiently clear and specific as to the details of the "participation." Does this clause mean that there shall be a sharing of the obligations as well as the profits? Does it connote an obligation to perform personal services or a part of the services required to be performed by the defendant Kensil in the new project? A perusal of the primary agreement and its many provisions and ramifications demonstrates the varied problems connected with a "participation." Were the parties merely to contribute a proportionate share of the cash required to be contributed by Kensil?
In order to be binding, a contract must be sufficiently exact to enable the court to give it an exact meaning.
*95 Where the terms of an agreement are not settled or reasonably certain, an essential element to a contract is missing. The alleged instrument is then nudum pactum. There is no method set forth in the alleged option sub judice for definitely ascertaining the basis for the parties to "participate" in a "subsequent project." The alleged option is not sufficiently definite in its terms for a reasonable ascertainment of what performances are to be rendered by each party. The court can make no better contract for the parties than they made for themselves. See Culver v. Culver, 39 N.J.L. 574 (Sup. Ct. 1877); Wadge v. Crestwood Acres, Inc., 128 N.J.L. 551 (Sup. Ct. 1942), affirming 20 N.J. Misc. 188, affirmed 129 N.J.L. 400 (E. & A. 1943); Hollander v. Gautier, 114 N.J. Eq. 485 (Ch. 1933); Montclair Distributing Co. v. Arnold Bakers, Inc., 1 N.J. Super. 568 (Ch. Div. 1948); Savarese v. Pyrene Mfg. Co., 9 N.J. 595 (1952).
Judgment will be entered for defendants, dismissing the complaint.