604 A.2d 229

NORTHWEST BERGEN COUNTY UTILITIES
AUTHORITY, PLAINTIFF, v. BOROUGH
OF MIDLAND PARK, DEFENDANT.

Superior Court of New Jersey
Law Division Bergen County

Decided January 14, 1992.

730

*DeMaria, Ellis, Hunt & Salsberg,* Attorneys for Plaintiff, Northwest Bergen County Utilities Authority (*William J. Hunt* and *Richard Haws* Appearing).

*Richard J. Allen, Jr.,* Attorney for Defendant, Borough of Midland Park.

*Stephen P. Sinisi, (Sinisi, Van Dam & Sproviero)* filed a brief on behalf of Amicus, Bergen County Utilities Authority.

## OPINION

KOLE, MARTIN J., J.A.D., Retired and Temporarily Assigned On Recall.

This action was brought by Northwest Bergen County Utilities Authority, ("NBCUA" or "the Authority,") for declaratory relief against the Borough of Midland Park, ("Midland Park,") regarding construction or interpretation of a Service Contract entered into by the parties. The parties have asserted that it involves a novel issue of state-wide significance, since the provisions in question are common in many municipal utility service contracts. Indeed, there is evidence that a municipality that is a member of another authority, the Bergen County Utilities Authority, may be construing the provisions in the same manner as Midland Park.

The Authority was established for the purpose of constructing and operating a District Sewer System. The District is comprised of sixteen municipalities, one of which is Midland Park.

On March 12, 1965, the Authority and several of the municipalities, including Midland Park, entered into a Service Contract, (the "Service Contract" or "the Contract,") which provides for the installation, construction and operation of a District Sewer System for those municipalities.[1] Pursuant to the Contract, the municipalities agreed to make payments to the Authority in return for the Authority's treatment and disposal of sewerage originating in the municipalities. Such payments are in lieu of payments which would otherwise be due and owing to the Authority from individual property owners within the contracting municipalities. The Contract mandates that the amount of the payments or service charges are to be calculated by the Authority by the 17th of January of each year. It requires that these service charges be of an amount sufficient

---

[1]Other municipalities that were parties to that Contract were Allendale, Ho–Ho–Kus, Ramsey, Waldwick and Wyckoff.

to provide for all expenses of operation, maintenance, depreciation and repair of the District Sewer System, including establishment and maintenance of working capital and reserves, and the payment and security of principal and interest on any bonds issued or to be issued pursuant to the Municipal and County Utilities Authorities Law, *N.J.S.A.* 40:14B–1 *et seq.*, so as to prevent the accrual of any deficit and to ensure that the Authority and the District Sewer System always remain self-supporting.

Of importance to the issue in this case is Article XII of the Service Contract.

Paragraph 1 of Article XII requires that each contracting municipality pay the annual service charge, established by January 17 by the Authority and certified by it, in equal quarterly payments, which equal quarterly payments *"shall be due on and be made on or before* the 15th day of February, May, August, and November of such year." (Emphasis supplied.) Each municipality is required in each year to make provisions for "all payments to become due from it to the Authority ... and shall pay to the Authority for the services rendered or to be rendered to it in the disposal of sewage, in each year in equal quarterly payments ..., the amount of money certified to it in or for such year by the Authority...."

Paragraph 3 of Article XII provides that:

If any part of any such installment or payment due to the Authority from any Municipality shall remain unpaid for thirty days following its due date, the Municipality shall be charged with and pay to the Authority interest on the amount unpaid from its due date until paid at the rate of eight per cent (8%) per annum, and the Authority, in its discretion and without releasing the Municipality from any obligation to pay therefor, may refuse to permit the Municipality to discharge sewage into the District Sewer System during the period of such default and, at the expense of the Municipality after 60 days notice of such default, may shut off from the District Sewer System, and upon the curing of such default reconnect, the sewer system of the Municipality or outfall thereof.

Paragraph 4 of Article XII provides that: "[t]he provisions of this Article ... shall be deemed a contract between each Municipality and the holders of all bonds authorized by the

[Municipal and County Utilities Authorities Law] and shall be enforceable by appropriate action at law or in equity." Pursuant to that law, the bond resolutions and agreements may require pledging or setting aside the Authority's revenues to secure the payment of the bond; and the Authority has the duty to enforce the Service Contract provisions and may be required to do so by the bondholders in the event there is a default in payment on the bond. *N.J.S.A.* 40:14B–30 and 31.

Midland Park has deliberately maintained a pattern of late or slow payment of the amounts due quarterly. The chart below indicates the pattern of late payment by Midland Park over four years ending in 1990:

|        | Due Date | Pay Date | Days Late |
|--------|----------|----------|-----------|
| 1987:  | 2/15/87  | 3/12/87  | 25        |
|        | 5/15/87  | 5/29/87  | 14        |
|        | 8/15/87  | 8/17/87  | 2         |
|        | 11/15/87 | 11/16/87 | 1         |
| 1988:  | 2/15/88  | 2/18/88  | 3         |
|        | 5/15/88  | 5/16/88  | 1         |
|        | 8/15/88  | 9/15/88  | 31        |
|        | 11/15/88 | 12/01/88 | 16        |
| 1989:  | 2/15/89  | 2/16/89  | 1         |
|        | 5/15/89  | 6/08/89  | 24        |
|        | 8/15/89  | 9/13/89  | 28        |
|        | 11/15/89 | 12/08/89 | 24        |
| 1990:  | 2/15/90  | 2/22/90  | 7         |
|        | 5/15/90  | 5/21/90  | 6         |
|        | 8/15/90  | 9/04/90  | 19        |

A review of Midland Park's records and minutes reveals the motive and purpose for such pattern of payment. On September 15, 1988, Midland Park enacted Resolution No. 185.88 which states:

WHEREAS, the agreement between the Borough of Midland Park and the Northwest Bergen County Sewer [sic] Authority allows for a grace period for the payment of the quarterly assessments;

NOW, THEREFORE, BE IT RESOLVED, by the Mayor and Council of the Borough of Midland Park that the Borough shall make its quarterly payments to the Northwest Bergen County Utilities Authority during the grace period allowed.

This resolution was passed with two dissenting votes.

The minutes of the Borough's September 8, 1988 "Work Shop Meeting" indicate, according to one councilman, that the Borough was aware that while "from a financial point of view, it is beneficial to wait the 30 days ... it is not solely a financial question;" and that in response, Mayor Faith Walker stated that "a policy adopted by another Council years ago, has no bearing on this Council. Utilizing the 30 days grace period will benefit the town by $5,000.00 in gained interest, per year." She appears to have been satisfied as to the legality of this practice under the Service Contract.

On September 28, 1988, the Authority advised Midland Park that its position could not be supported by the express terms of the Service Contract and had threatened suit concerning the Resolution. In response to this information, the Borough unanimously passed Resolution 248.88 on November 10, 1988 which rescinded Resolution No. 185.88.

The Borough's rescission of the resolution did not, however, signal any actual change in its practice of remitting payment of the service charges beyond the due dates set forth in the Service Contract.

For example, Midland Park made its November 15, 1988 payment 16 days late, its May 15, 1989 payment 24 days late, its August 15, 1989 payment 28 days late and its November 15, 1989 payment 24 days late. Not only did Midland Park fail to pay its service charge in a timely manner since rescinding Resolution No. 185.88, but it has failed to remit payments on the "due date" set forth in Paragraph 1, Article XII of the Contract after the third quarter of 1986 payment.

Thus, the pattern of and motivation for Midland Park's behavior are clear. It is to earn the interest, for itself, on that money that is paid within what it considers a grace period of

thirty days. There is ample evidence that such routine late payments, if permitted by the Contract, will cause the Authority economic injury that extends even beyond simply being deprived of its funds.

Midland Park's pattern of late payment, according to the Authority, is a unilateral modification of the Contract and a breach of contract. Its actions are said to have an adverse effect upon the relationships among various parties to the Service Contract, most notably those between the Authority and the bondholders and between the Authority and other member municipalities. Moreover, although there have been some late payments by other contracting municipalities, it appears that none of them shares Midland Park's interpretation of Article XII of the Service Contract. It is also asserted that if the Contract is interpreted so as to permit routine late payments by participating municipalities, the Authority's bond rating, its ability to secure cost-effective bond insurance and to borrow money generally will be significantly impaired, since it is inevitable that the Authority may seek to borrow funds or issue bonds in the future.

The Authority contends that the impairment of the bondholders' contract with the Authority is clear; that despite the fact that the currently predominant bond rating convention looks primarily to the quality and stability of the bond's insurer and not to the underlying payment basis of the bonds, a pattern of late payment will still have a cognizable adverse impact upon the Authority; that even if the quality of the insurance is the primary factor in rating bonds and irregularities in the underlying debt tend to be ignored, the cost of the insurance itself is controlled and adversely affected by any irregularity and instability in the underlying debt; that increased insurance costs will make the Authority's bond issues less marketable even if insurance is obtainable; that previous bond issues have, in their Official Statements, disclosed both the underlying demographic constitution of member municipalities and the existence of any irregularities; that this focus in the Official Statements upon

the underlying source of payment requires prudent bond counsel to disclose any scheme or pattern of late payment, especially when established by intentional action; and that disclosure of Midland Park's activities and its refusal to change its practice in such a future Official Statement would further deflate bond values.

The Authority has submitted proofs which I find essentially support the foregoing potential ramifications of Midland Park's conduct under the Service Contract, particularly if adopted by all of the Contract's municipalities. But, the determination in this case does not rest on those proofs alone. Much of that evidence is from experts in the field. Their opinions are entitled to due consideration, even though, in the context of this matter, they tend to be somewhat speculative in nature in assessing possible future events. Thus, although the expert opinions may lend substantial strength to the decision on the issue in this case, they cannot serve as an appropriate single basis for that decision. The basic focus must be on the Contract itself.

The issue in this case involves the proper interpretation of the language of, and intent of the parties to, the Contract, including the payment provisions, at the time the Contract was entered into. In interpreting or construing the Contract, the Court considers the language of the Contract and gives it a rational meaning in accordance with its general purpose, as well as the policy considerations inherent in the Municipal and County Utilities Authorities Law underlying the Contract. *See Jacobs v. Great Pacific Century Corp.*, 104 *N.J.* 580, 586–587, 518 *A.*2d 223 (1986); *Karl's Sales & Serv. v. Gimbel Bros.*, 249 *N.J.Super.* 487, 492, 592 *A.*2d 647 (App.Div.1991); *Liqui–Box v. Estate of Elkman*, 238 *N.J.Super.* 588, 599, 570 *A.*2d 472 (App.Div.1990), certif. den. 122 *N.J.* 142, 584 *A.*2d 214 (1990); *Clay v. East Orange*, 177 *N.J.Super.* 79, 84, 424 *A.*2d 1199 (Law Div.1980), aff'd o.b. 181 *N.J.Super.* 40, 436 *A.*2d 553 (App.Div.1981), aff'd o.b. 91 *N.J.* 429, 452 *A.*2d 1323 (1982).

■ In doing so, the Court must consider the entire contract, as well as the words employed in the specific provisions to be interpreted. A subsidiary provision should not be interpreted so as to conflict with the dominant purpose of the contract. *Newark Publishers' Assn. v. Newark Typographical Union,* 22 *N.J.* 419, 426, 126 *A.*2d 348 (1956); *Wheatly v. Sook Suh,* 217 *N.J.Super.* 233, 239–240, 525 *A.*2d 340 (App.Div.1987). *See also Browning–Ferris v. City of Passaic,* 116 *N.J.* 83, 88–89, 560 *A.*2d 1208 (1989); *Onderdonk v. Presbyterian Homes of N.J.,* 85 *N.J.* 171, 182–184, 425 *A.*2d 1057 (1981); *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N.J.* 293, 301, 96 *A.*2d 652 (1953). If possible, effect should be given to all parts of the contract and an interpretation or construction which gives reasonable meaning to all of its provisions is preferred to one that leaves a portion of the writing useless or inexplicable. *Bullowa v. Thermoid Co.,* 114 *N.J.L.* 205, 209–210, 176 *A.* 596 (E. & A. 1935); *Goldberg v. Commercial Union Ins. Co. of N.Y.,* 78 *N.J.Super.* 183, 190, 188 *A.*2d 188 (App.Div.1963); *Cooper v. Kensil,* 31 *N.J.Super.* 87, 91, 106 *A.*2d 27 (Ch.Div. 1954) aff'd 33 *N.J.Super.* 410, 110 *A.*2d 559 (App.Div.1954).

■ Following these principles of construction or interpretation, a review of the language of the Contract reveals only one reasonable conclusion: that there is no "grace period" for quarterly payments and, thus, they may not be routinely made within the 30–day period after they are due.

The intention of the parties at the time the Contract was entered into is evident from a consideration of the two payment provisions separately and together.

■ Article XII, Paragraph 1 states that equal quarterly payments *"shall be due on and be made on or before the* 15th day of February, May, August, and November ...". (Emphasis supplied.) The word "shall" is mandatory under the Contract's definitions provisions (Appendix A, Sec. 1.22) and according to ordinary usage. *See Greate Bay Hotel & Casino v. Guido,* 249 *N.J.Super.* 301, 303, 592 *A.*2d 319 (App.Div.1991);

*Cooper, supra,* 31 *N.J.Super.* at 92, 106 *A.*2d 27. This provision, therefore, establishes when payments shall be or are "due." A debt or other obligation is "due" at the time when the creditor has the right to demand payment and to enforce collection if not paid. *Etz v. Perlman,* 103 *N.J.Eq.* 425, 427, 143 *A.* 548 (Chanc.1928); *Atlantic City v. Economic Develop. Auth.,* 5 *N.J.Tax* 137, 144 (1983), aff'd o.b. 6 *N.J.Tax* 344 (1984). Thus, under Paragraph 1, the Authority has the right to demand payment and to enforce collection on the 15th days of February, May, August and November. Payments are expected to be made on or before those dates. There is nothing in this provision to suggest that payment after the 15th day of February, May, August or November is or should be acceptable to the Authority.

Article XII, Paragraph 3, however, makes reference to the acceptability of late payments. It states, in relevant part, that "if any part of any such installment or payment shall remain unpaid for 30 days following its due date, the municipality shall be charged with and pay to the Authority interest on the amount unpaid from its due date until paid at the rate of eight per cent (8%) per annum."

Midland Park claims that since there is no penalty for paying within 30 days of the due date, those 30 days constitute a "payment window" or "grace period," (hereinafter sometimes referred to as "the Period,") and that payments made within the Period are in accordance with this provision of the Contract.

The Authority contends, however, that payments are due and payable on or before the 15th of February, May, August and November and that the period of 30 days is only intended to provide some flexibility in limited and extraordinary circumstances. According to Emil Porfido, the Executive Director of NBCUA, such circumstances are not routine occurrences, but rather "one-time incident[s]," such as a temporary municipal budget crisis or other emergent situation. The Authority correctly argues that the Contract did not contemplate or intend

that the Period would be used routinely by any of the municipalities, since such a practice not only would create a fiscal problem for the Authority and its bondholders but would be unfair to the other member municipalities who pay on the due date.

The language of the Contract clearly supports this intention and construction.

Paragraph 3, Article XII, the alleged grace period provision, states that it would only be applicable if any part of an installment or payment remains unpaid for 30 days following the "due date." The use of the word "if" at the beginning of this paragraph, rather than the use of a word such as "when," indicates that the language in this provision was not intended to apply to all payments due from a municipality, but only to those payments that were late for some satisfactory reason. Thus, payment after the 15th of February, May, August or November was not contemplated as a routine occurrence or as permitting a 30 day grace period as a matter of course.

Further, the word "part" in this provision is noteworthy. Paragraph 3, Article XII addresses situations in which any *part* of any installment or payment due remains unpaid for 30 days following its due date. Consequently, the Contract does not contemplate an entire payment being made within 30 days after the due date as a matter of course. It is expected that, at minimum, the municipalities will make a partial payment of as much as possible, as a good faith effort to abide by the terms of the Contract, specifically, Article XII, Paragraph 1, requiring that quarterly payments shall be due and made on or before the 15th day of the specified months.

When the two payment provisions at issue are construed together, it is clear that payments of quarterly installments must be made on their respective due dates—the 15th days of February, May, August and November. If any part of such an installment or payment due remains outstanding for 30 days following the due date, interest will accrue on the late payment

from *that due date until paid* at the rate of 8%. But such interest provision does not in any wise extend the due date of an installment or provide for a grace period before a default may be declared if a payment is not made on that date.

That construction gives effect and a reasonable meaning to both provisions of the Contract, as well as other Contract provisions. It also furthers the Contract's business efficacy and purpose, as well as the intent of the statute pursuant to which the Contract was executed. *See Onderdonk, supra,* 85 *N.J.* at 182, 425 *A.*2d 1057.

Thus, for example, Paragraph 4 of Article XII of the Contract provides that "the provisions of this Article ... shall be deemed a contract between each Municipality and the holders of all bonds authorized by the [Municipal and County Utilities Authorities Law] and shall be enforceable by appropriate action at law or in equity." A reasonably predictable and constant flow of revenue to the Authority from each municipality is contemplated by this provision. The Authority has the duty under *N.J.S.A.* 40:14B–30 and 31 to enforce the Service Contract in order to assure such a flow so as not to be in violation of its contractual and statutory obligations to pay amounts due to holders of its bonds and to be self-sufficient.

It should also be noted that the statute even requires a municipality "promptly" to pay the Authority service charges that the Authority may charge to it as "owner or occupant of any real property." *N.J.S.A.* 40:14B–54.[2] Manifestly, therefore, charges due from the municipality for services rendered to its real property owners by the Authority must be paid promptly.

---

[2]The Authority seeks a construction of this provision as itself requiring prompt payment by the Municipality of the installments under the Contract on the due dates. This construction does not appear to be correct. *See Hamilton Tp. Auth. v. Apple Tree Corp.,* 202 *N.J.Super.* 440, 444, 495 *A.*2d 434 (App.Div. 1985), certif. den. 102 *N.J.* 327, 328, 508 *A.*2d 206 (1985).

On the other hand, a construction which would permit Midland Park at all times to make its quarterly payments within thirty days of the 15th days of February, May, August and November would render the mandatory language of Paragraph 1, Article XII, meaningless.

If payments were routinely made within thirty days of the due dates listed above, then those dates merely become symbolic of the time when, within thirty days, the Authority may expect to receive quarterly payments. Aside from the fact that it is highly questionable that the Authority could operate efficiently or be self-supporting if payments from all of the municipalities were received at different times within the alleged thirty day alleged grace period, interpreting the contract in such a way renders meaningless the words "shall be due ... and be made" on the dates specified in Paragraph 1. The language of Article XII, Paragraph 1 is clear: Except in truly exceptional circumstances, payments are due and must be made on or before the 15th days of February, May, August and November, not within thirty days of those dates. The thirty day Period was not intended for routine usage or as a true "grace period."

The policy and purpose of *N.J.S.A.* 40:14B–1 *et seq.*, the Municipal and County Utilities Authority law ("the Act"), is completely harmonious with this interpretation of the Contract. The purpose of the Act is to provide for, among other things, the collection, disposal and recycling of solid waste, including sewage sludge, in an environmentally sound manner and reduce and ultimately abate, the menace to the public health resulting from pollution caused by such sewage. In order to achieve these ends, the legislature has authorized the creation of utilities authorities to construct, maintain and operate sewerage disposal facilities. Further, the authorities are authorized to fund such facilities by issuing bonds and by collecting service charges from the landowners who are the recipients of the sewerage disposal services. The Act also permits the authorities to enter into contracts with municipalities wherein the

municipalities will pay the service charges to the authorities in lieu of payments owed by constituent landowners within their boundaries. The Service Contract entered into by NBCUA and Midland Park is such an agreement. By contracting with the Authority in this manner, Midland Park, as well as the other municipal parties to the Contract, in essence, have assumed the obligations of their constituent landowners to pay sewer service charges, "as and when due." *See N.J.S.A.* 40:14B–41 through 47, 40:14B–22. In the context of the Service Contract this means that they have undertaken to pay on or before the due dates specified in the Contract, the quarterly installments of the annual service charge certified by the Authority and to be bound by all of the provisions of the Contract and the Act, including those that would ensure, through such prompt payment, the effective and self-supporting functioning of the Authority and its sewerage system, and compliance with its bond obligations.

Midland Park analogizes the language of the Service Contract to that of the municipal real estate tax statute, *N.J.S.A.* 54:4–1 *et seq.* In particular, *N.J.S.A.* 54:4–67 provides, in pertinent part, that the municipality *"may provide* that no interest shall be charged if payment of any installment is made within the tenth calendar day following the date upon which the same became payable." (Emphasis supplied.) This clause gives the municipality the option of allowing a ten day grace period. That option, if elected, would preclude the municipality from charging interest if payment is made during that grace period.

This is distinguishable from the Service Contract, which provides, in part, that ... "if any part of such installment or payment due ... shall remain unpaid for thirty days following its due date, the municipality *shall be charged*" interest from its "due date." (Emphasis supplied.) This clause explains the circumstances under which the Authority is compelled to charge interest and not the circumstances under which it is precluded from doing so. Further, the interest under the

Contract is payable from its "due date" and is thus not an actual grace period that would bar a contract default if the quarterly payment is not made when due, except where unusual circumstances reasonably excuse such a declaration of default.[3]

Midland Park also asserts that Paragraph 3, Article XII is similar to a grace period clause in a mortgage, which precludes acceleration of the entire debt due or a default resulting in a foreclosure where either nonpayment or late payment, or the like, is remedied within a specified period.

Many New Jersey mortgages provide for grace periods in their acceleration clauses. Thus, in *Louis Satanov & c., Corp. v. Jose S. Naame Co.*, 103 *N.J.Eq.* 383, 143 *A.* 530 (Chanc.1928), aff'd o.b. 107 *N.J.Eq.* 182, 151 *A.* 594 (E. & A.1930), the mortgage contained an agreement that

> if at any time default should be made in the payment of interest for the space of thirty days after the semi-annual payment thereof shall fall due, then the whole principal sum with all unpaid interest should, at the option of the mortgagee or its successors or assigns, become immediately due. *Id.* 103 *N.J.Eq.* at 384, 143 *A.* 530.

The Court held that such periods are indeed "grace periods"—that is, the mortgagor is not in default unless payment is not made by the end of the grace period and the creditor may not accelerate the loan or foreclose on the property until that time. *Id.* at 386, 143 *A.* 530.

There is no comparable grace period in Paragraph 3, Article XII, the late payment clause of the Service Contract. That 30–day period is only indicative of the time when interest will and must be charged for a late payment; it does not permit payments to be made within 30 days of the due dates (the 15th day of February, May, August and November) as a regular practice.

It is important to note, as indicated, that a debt or obligation is "due" at the time when the creditor has the right to demand

---

[3]The tax provision itself is inapplicable since a sewerage service charge is not a "tax." *Clay, supra,* 177 *N.J.Super.* at 84, 424 *A.*2d 1199.

payment and to enforce the collection if not paid. *Etz, supra,* 103 *N.J.Eq.* at 427, 143 *A.* 548. Accordingly, since a mortgage payment cannot be demanded or the mortgage enforced until the end of the grace period, it is not "due" until that time. The Service Contract, however, provides that the payments are "due" on the specified dates, and if payments are not made by those "due dates," interest will be assessed from the very first day the payment is late and not from 30 days thereafter, irrespective of the fact that the interest may not be collected until after that 30 day period.

This provision as to acceptance of late payments after the due dates and not requiring the payment of interest until after the 30th day following such due dates does not change the fact that the municipality is in default if it does not pay on or before the specified quarterly date.

Paragraph 3, Article XII is more akin to the mortgage provision involved in *Auto–Plaza v. Central Bank of Alabama,* 394 *So.*2d 6 (Sup.Ct.Ala.1980). An issue in that case was whether a provision in a mortgage created a 15 day grace period. The mortgage provided that it "is understood and agreed that a late charge of five cents ($.05) per dollar will be paid by the maker(s) on each installment more than 15 days in arrears." *Id.* at 8. It further provided:

Upon failure to pay any installment of principal and/or interest when due or if any of the conditions and requirements in said mortgage be not complied with, the entire principal sum at the option of the holder, shall become due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. *Id.*

The Supreme Court of Alabama stated that "[w]e fail to see how this [late charge] provision affords the mortgagor a grace period ... and we hold that this provision merely subjects Auto–Plaza to a late charge for any installment paid more than 15 days after the *due date....*" *Id.* (Emphasis supplied.) The Court held further that failure to pay any installment by the *due date* is considered a default and subjects the borrower to foreclosure.

The Service Contract similarly provides that an interest charge is to be paid by the municipality for any part of any installment more than 30 days in arrears. The payment is *due* on the 15th of the specified month and interest is to be charged for any payment or part of a payment not made within 30 days of that *due date.* However, as in *Auto–Plaza,* this does not absolve the municipality from being in default or delinquent in its payment if the entire payment is not made on time, that is, by the installment due date. The 30–day period is not a grace period. It merely expresses the time when the municipality *must* pay the Authority interest.

The evidence indicates that Midland Park's late payments have resulted in the loss of several thousand dollars per year to the Authority. Further, the testimony of the Authority's witnesses, both expert and non-expert, demonstrates that the continuation of this late payment practice, by all or a majority of the municipalities is likely to result in a rise in rates for all member municipalities. In fact, the Executive Director of the Authority has received complaints from other member municipalities objecting to Midland Park's late payment practice. It is reasonable to infer that if Midland Park is allowed to continue to make payments after the due dates, the other municipalities may follow suit. The evidence shows that the Authority stands to lose $40,000—$50,000 per year in interest if all of the municipalities make routine late payments. Since, according to the Executive Director's testimony, 90–95% of the Authority's funds are dependent upon prompt payments by the municipalities, late payments by all of the member municipalities will inevitably result in an increase in rates for all Service Contract members.

Even if the other municipalities do not adopt a similar late payment practice, these municipalities will be unfairly burdened and discriminated against and Midland Park will be afforded an undue advantage if it continues to make late payments as a matter of course. A construction that would permit this result must be avoided. *Cf. First Peoples Bank of New Jersey v.*

*Township of Medford,* 126 *N.J.* 413, 599 *A.*2d 1248 (1991); *Bay Point Yacht Harbour, Inc. v. Jersey Central Power & Light Co.,* 251 *N.J.Super.* 453, 598 *A.*2d 916 (App.Div.1991); *N.J.S.A.* 40:14B–22.

■ A contrary interpretation would also violate the covenant of good faith and fair dealing implicit in the Service Contract—that no party, including a municipality, will injure the right of another to receive the fruits of the Contract. *Onderdonk, supra,* 85 *N.J.* at 182, 425 *A.*2d 1057; *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426–427, 495 *A.*2d 1313 (1985).

Midland Park has adopted the late payment program in order to be able to earn interest for itself during the time it retains the money. Thus, the Mayor testified, $5,000 in interest so earned could be used for a municipal purpose, the library. The Contract does not permit late payments for this purpose. Midland Park is using money that should be paid the Authority for itself, at the expense of the Authority and the other municipalities.

In view of the foregoing, I need not consider or decide the merits of the other contentions raised by the Authority, including the arguments that Midland Park's conduct (1) may violate the "Cap Law;"[4] and (2) may violate Midland Park's duty not to retain or use money which it collects from its landowners for payment to the Authority, on the theory of constructive trust.[5]

---

[4]The Authority contends as follows: The "Cap Law", *N.J.S.A.* 40A:4–45.1 et seq. is intended to place limitations on municipal spending. Under *N.J.S.A.* 40A:4–45.3j, money paid by municipalities for sewer services are excepted from the "cap"; and the use of this money to generate income for municipal purposes violates the statute. But it should be noted that the only use of such income by Midland Park evinced by the proofs is for the library, which is also an excepted expenditure under the Act. *N.J.S.A.* 40A:4–45.3r.

[5]*See Bd. of Ed. Fair Lawn v. Mayor, Coun. Fair Lawn,* 143 *N.J.Super.* 259, 268, 362 *A.*2d 1270 (Law Div.1976), aff'd o.b., 153 *N.J.Super.* 480, 380 *A.*2d 290 (App.Div.1977); *D'Ippolito v. Castoro,* 51 *N.J.* 584, 588–89, 242 *A.*2d 617 (1968).

## CONCLUSION

I find that Midland Park has misinterpreted the 30–day period as a grace period and that the routine tendering by it of payments after the due dates set forth in Article XII, Paragraph 1 of the Contract does not comply with that Contract. At the time that the parties entered into the Contract, they intended payments to be made on or before the due dates set forth in Paragraph 1. The 30 day period described in Article XII, Paragraph 3 of the Contract was not intended as a grace period, but only as a period of flexibility for municipalities experiencing an exceptional situation, such as an emergent fiscal crisis or other unanticipated satisfactory reason for a late payment.

Accordingly, I hold that Midland Park is required, according to the terms of the Contract, to tender payments to the Authority on or before the 15th days of February, May, August and November of each year. There is no 30 day grace period.

What constitutes an emergent fiscal crisis or other unanticipated situation permitting late payments is not decided. There was insufficient evidence on this issue. It is evident, however, that the Authority must determine that matter on a case by case basis, and that its determination must, in all respects, be reasonable and non-discriminatory. It might consider issuing guidelines, by means of regulations or otherwise, covering this matter. See *First Peoples Bank of New Jersey v. Township of Medford, supra.*

Judgment will be entered in favor of plaintiff and against defendant. No costs.